08-2762-bk
In re Dana Corporation:
Jasco Tools, Inc.
v. Dana Corporation

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2008

(Argued: January 15, 2009      Decided: July 31, 2009)

Docket No. 08-2762-bk

_____

IN RE: DANA CORPORATION,

Debtor,

JASCO TOOLS, INC.,

Appellant,

- v. -

DANA CORPORATION,

Appellee.
_____

Before: KEARSE, HALL, and LIVINGSTON, Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York, Richard M. Berman, Judge, affirming decision of bankruptcy court granting summary judgment in favor of debtor-appellee despite the existence of factual disputes and despite the request by creditor-appellant for compliance with a 2005 discovery request, see In re Dana Corp., No. 06-10354, 2007 WL 3376882 (Bankr. S.D.N.Y. Nov. 6, 2007).

Vacated and remanded.

ALEXANDER GEIGER, Rochester, New York (Geiger & Rothenberg, Rochester, New York, on the brief), for Appellant.

WILLIAM G. GANDY, McLean, Virginia (Wilson, Elser, Moskowitz, Edelman & Dicker, McLean, Virginia, on the brief), for Appellee.

KEARSE, Circuit Judge:

Jasco Tools, Inc. ("Jasco"), appeals from a judgment of the United States District Court for the Southern District of New York, Richard M. Berman, Judge, affirming a decision of the United States Bankruptcy Court for the Southern District of New York, Burton R. Lifland, Judge, which granted summary judgment in favor of debtor-appellee Dana Corporation ("Dana") and disallowed Jasco's claim in the bankruptcy proceeding, see In re Dana Corp., No. 06-10354, 2007 WL 3376882 (Bankr. S.D.N.Y. Nov. 6, 2007) ("Bankruptcy Court Decision" or "Decision"). On this appeal, Jasco contends principally (1) that several of the bankruptcy court's procedures leading to summary judgment were inappropriate, (2) that the court should have granted Jasco's request for additional discovery before resolving the summary judgment motion, and (3) that the existence of genuine issues of material fact should have prevented the granting of summary judgment in Dana's favor. Finding merit principally in Jasco's second and third contentions, we vacate the judgment and remand for further proceedings.

I. BACKGROUND

Dana is a purveyor of modules, systems, and components for original equipment manufacturers in the automotive industry; Jasco is a precision machining company. Until December 31, 2000, Jasco and Dana or Dana's predecessor-in-interest were parties to an

- 2 -

agreement pursuant to which Jasco agreed to manufacture, and Dana agreed to purchase, precision-machined parts for Dana's heavy axle and brake business (the "Purchase Agreement" or "Agreement"). According to Eugene W. Baldino, who was Jasco's chief executive officer after May 31, 1999, "[t]he annual volume of business between Jasco and [Dana], pursuant to the Purchase Agreement, was approximately $24 million." (Declaration of Eugene W. Baldino dated September 19, 2007 ("Baldino Decl." or "Declaration"), ¶ 4.) According to Adam Haybach, Dana's purchasing manager for the parts in question during the relevant period, this "was one of the largest contracts Dana had with any of its suppliers." (Affidavit of Adam Haybach dated January 4, 2002 ("Haybach Aff."), ¶ 3.)

The Agreement provided that the parties would, in the second quarter of 1999, seek to negotiate an extension of the Agreement's term beyond 2000. Jasco's claim against Dana's bankruptcy estate arises out of the manner in which the Purchase Agreement ended, focusing in particular on events in the summer of 1999 that culminated in Dana's contracting with a Jasco competitor, Nationwide Precision Products Corporation ("Nationwide"), to supply the parts previously supplied by Jasco. The following description of the events is drawn principally from documents submitted to the bankruptcy court, including Baldino's Declaration and the exhibits attached to it, consisting chiefly of records, affidavits, and deposition excerpts obtained in a state-court action brought by Jasco against Dana, Nationwide, and three former Jasco employees for, inter alia, breach of contract, unjust

- 3 -

enrichment, tortious interference with contract, and misappropriation of Jasco trade secrets. We describe the record in the light most favorable to Jasco, the party against which the bankruptcy court granted summary judgment.

A.   The Events of 1999

Until the summer of 1999, three Jasco employees were responsible for all aspects of Jasco's performance of its contract with Dana: Jasco president Gary Rogers, Charles "Chuck" Zicari, a regional sales manager, and Sean Convertino, an engineering and quality assurance manager. Rogers was "Dana's primary contact person at Jasco." (Haybach Aff. ¶ 4.) Rogers retired from Jasco effective May 31, 1999, at the age of 50. The timing of his retirement was not of his own choosing. (See Deposition of Gary Rogers at 47-48.) According to Jasco, "Rogers took numerous confidential documents when he left Jasco." (Baldino Decl. ¶ 11.)

Zicari resigned from Jasco on July 9; Convertino resigned from Jasco on July 16. During the week after Zicari left Jasco, while Convertino was still there, Convertino told Zicari he had computer files containing Jasco information as to the processes, costs, and budgets for the parts made for Dana. (See Deposition of Sean Convertino ("Convertino Dep.") at 84-87.) Zicari told Convertino that "it would be helpful for competitive reasons to have that information available after [Convertino's] departure." (Id. at 87-88.) Thus, "[w]hen Mr. Convertino left Jasco, he retained information from Jasco on his personal computer such as

- 4 -

machining cycle times, pricing information, and a list of machines required for performance under the Agreement," Bankruptcy Court Decision, 2007 WL 3376882, at *1.

The files taken by Convertino contained information that had, "over a number of years," been "developed by [Convertino] as well as other employees at Jasco." (Convertino Dep. at 89; see id. ("I didn't develop it singularly").) The information was nonpublic (see id.) and was "proprietary to Jasco" (id. at 290). Convertino testified, "I felt it was unethical I had left with Jasco's information." (Id. at 1740.) One reason Convertino took the files was that he had "some animosity" toward Jasco. (Id. at 44.)

Convertino's other reason was that the files "contained all of the financials and manufacturing process outlines" (id. at 89), including "speed and feed calculations for moving materials" (id. at 44), making it "very helpful in estimating manufacturing processes" and "[p]roduc[ing] cost estimates" (id. at 44-45; see also Baldino Decl. ¶ 20 (the computer disk that Convertino took with him "contained some 4000 pages of technical details about Jasco's manufacturing processes with respect to the Dana parts")). Convertino had in mind that the data "would be a benefit to Chuck and myself if we started up a business" (Convertino Dep. at 1740), or "useful to someone else trying to compete with Jasco" (id. at 44-45). He took all the Jasco data he thought would be of use (see id. at 1738-40) if they wanted to "go

after the Dana business" "[w]ith some other company" (id. at 1739).

On August 9, 1999, Convertino became an employee of Nationwide; on August 16, 1999, Zicari became an employee of Nationwide. "In his new position at Nationwide, Mr. Zicari played a role in soliciting the Dana business[,] and Mr. Convertino helped prepare Nationwide's proposal to Dana." Bankruptcy Court Decision, 2007 WL 3376882, at *1. Dana soon agreed to replace Jasco with Nationwide as its post-2000 supplier, sending Nationwide a December 20, 1999 letter of intent stating the expectation that the contract with Nationwide would be finalized by the end of January 2000. (See Baldino Decl. Exhibit J.) In February 2000, Convertino received from Nationwide a raise in salary, the promise of another 9% raise at the beginning of 2001, a bonus of $20,000, and the promise of an additional $22,000 bonus to be paid in 2001, for "his involvement in securing the Dana Contract." (Baldino Decl. Exhibit K (February 29, 2000 memorandum from Ron Ricotta, Nationwide's president and chief executive officer, to "The Personnel File of Sean Convertino").)

The Dana management team responsible for purchasing the items covered by the Purchase Agreement with Jasco consisted of purchasing manager Haybach, his boss Paul E. Blanchard, who was the general purchasing manager for Dana's heavy truck group, and Robert A. Buss, a purchasing product analyst who reported to Haybach. (See Deposition of Adam Haybach ("Haybach Dep.") at 74, 110.) With respect to the contention that Dana knew of and

- 6 -

encouraged the misappropriation of Jasco's confidential and proprietary information, Jasco "obtained telephone records showing dozens of phone calls between and among Rogers, Zicari, Haybach, and Buss throughout June, July, and August of 1999." (Baldino Decl. ¶ 13 n.2.)

Buss, in his state-court deposition, testified that he had no reason to have contact with Rogers after Rogers retired (see Deposition of Robert A. Buss ("Buss Dep.") at 92) and that in fact he did not have any conversations with Rogers after May 31 (see id. at 88, 91). The telephone company records, however, indicate that Rogers called Buss several times in the days and weeks following his May 31 retirement from Jasco, and that calls on June 7 and August 12 lasted 30 minutes and 25 minutes, respectively. (See Baldino Decl. ¶ 32.) When confronted with the records, Buss acknowledged that the telephone number called was his number at Dana but testified that he had no recollection of the calls. (See Buss Dep. at 88-89, 91.)

The telephone calls principally relied on by Jasco, including those from Rogers to Buss, as well as several from Zicari to Buss or Haybach, occurred on the following dates:

| | |
|---|---|
| June 4 | Rogers called Buss |
| June 7 | Rogers called Buss; they spoke for 30 minutes |
| June 29 | Zicari called Haybach |
| July 1 | Zicari called Haybach |
| July 6 | Zicari called Buss |
| July 6 | Zicari called Haybach |
| July 13 | Zicari called Haybach |
| July 13 | Zicari called Buss |
| July 16 | Zicari called Buss |
| August 12 | Rogers called Buss; they spoke for 25 minutes |
| August 12 | Rogers then immediately called Zicari; they spoke for 13½ minutes |

August 12    Zicari then immediately called Nationwide
August 20    Zicari called Buss
August 20    Zicari called Buss again

(See Baldino Decl. ¶¶ 32-40.)    In late August, Zicari called Jeffrey Nuccitelli, Nationwide's vice president for sales, to inform him that Nationwide had "an opportunity with Dana." (Deposition of Jeffrey Nuccitelli ("Nuccitelli Dep.") at 110.)    An October 6, 1999 memorandum by Nuccitelli and Ricotta, stating that "[w]e now have a very precise list of the active part numbers and the annual forecasts" (apparently a reference to information that Nationwide had recently received directly from Dana pursuant to a Haybach instruction to Buss), described the "Dana Opportunity" as "an opportunity to generate $25M in sales with no acquisition costs."    (Baldino Decl. Exhibit J.)

On September 30, Haybach had instructed Buss to "pull a print/quote package for all Jasco parts for Nationwide/Zicari." (E-mail from Haybach to Buss dated September 30, 1999.)    Haybach's e-mail stated, inter alia, that Zicari had "verbally committed to a 10% price reduction from Jasco's 1/1/2000 pricing."    (Id.) After several subsequent meetings between employees of Dana and employees of Nationwide, including Haybach, Buss, Zicari, and Convertino, Nationwide submitted to Dana a detailed written proposal, addressed to Blanchard, dated November 26, 1999.    (See Baldino Decl. ¶¶ 14-15; id. Exhibits D, E, F.)    Nationwide's November 26 proposal included a detailed price list for approximately 130 different parts (see Baldino Decl. ¶ 16; id. Exhibit F), on which Nationwide "undercut Jasco's price on every

- 8 -

part by exactly 10 percent" (Baldino Decl. ¶ 24 (emphasis in original)).

With respect to negotiations for an extension of the Purchase Agreement with Jasco, Haybach and Buss met with Jasco on December 3, 1999. The parties' descriptions of that meeting diverge. According to Baldino, he

> presented Jasco's proposal for the renewal period, which sought modest increases over the life of the extension term. In response, Adam Haybach simply told me that Dana was looking for a price reduction, and that unless Jasco cut its prices across the board, we had nothing to talk about. The next thing we heard from Dana was a phone call, on or about December 20, 1999, telling us that Dana had decided not to renew the Purchase Agreement with Jasco.

(Baldino Decl. ¶ 18 (emphasis added).) According to Haybach, Dana was anticipating a proposal for modest price increases and Haybach was "stunned" when, "at the December 3, 1999 meeting, Mr. Baldino demanded a very substantial across the board price increase that was far in excess of what Dana could reasonably accept." (Haybach Aff. ¶¶ 12, 9.)

Haybach and Blanchard submitted affidavits in Jasco's state-court action stating that it was only after that December 3 meeting with Jasco that Dana had contact with Nationwide. (See Haybach Aff. ¶¶ 13-14 ("upon receiving Mr. Baldino's response, I sought potential new suppliers to begin work upon expiration of the Dana/Jasco contract," and "[i]n that regard, Dana contacted Nationwide" (emphases added)); Affidavit of Paul Blanchard dated October 3, 2001, ¶ 5 ("Jasco requested an unacceptable price increase for the contract extension which caused Dana to

- 9 -

investigate other sources to provide the necessary work," and Dana received the favorable Nationwide proposal "[d]uring that search" (emphases added)).) As indicated above, however, Haybach had informed Buss by e-mail on September 30 of Nationwide's oral offer to supply the parts at a 10% discount; and Nationwide's written proposal confirming that 10% discount, addressed to Blanchard, was given on November 26. (See also Haybach Dep. at 101 ("Q. You received the quotation from Nationwide before you received the pricing direction from Jasco? A. Yes.").)

B. Jasco's Action in State Court

In 2001, Jasco commenced suit in New York State Supreme Court against Rogers, Zicari, and Convertino, alleging that they had engaged in concerted action to divert Dana's business from Jasco to Nationwide, resulting in Jasco's loss of business with Dana after the Purchase Agreement's five-year term expired. Jasco asserted causes of action for, inter alia, breach of fiduciary duty and misappropriation of Jasco's confidential business information. Jasco eventually settled its claims against Convertino; the Supreme Court granted summary judgment dismissing the claims against Rogers and Zicari, a decision that was reversed on appeal "[b]ecause only minimal discovery had been conducted prior to the motions," Jasco Tools, Inc. v. Rogers, 303 A.D.2d 944, 946, 757 N.Y.S.2d 651, 653 (4th Dep't 2003) ("Jasco I").

In July 2002, Jasco brought suit against Dana and Nationwide; after Jasco I reinstated Jasco's action against Rogers

and Zicari, the two actions were consolidated (the "Lawsuit"). Jasco asserted causes of action against Dana for, inter alia, breach of agreement to negotiate in good faith, misappropriation of trade secrets, and unjust enrichment, and sought $20 million in damages. The parties proceeded with discovery; from Dana, Jasco took three depositions, lasting a total of five days, and received responses to interrogatories and two document demands.

Jasco ultimately settled its claims against Zicari and Nationwide; and the Supreme Court again granted summary judgment in favor of Rogers, a decision that was again reversed by the Appellate Division because Jasco's discovery had not been completed, see Jasco Tools, Inc. v. Rogers, 45 A.D.3d 1296, 844 N.Y.S.2d 810 (4th Dep't 2007) ("Jasco III"), reversing Jasco Tools, Inc. v. Rogers, Index No. 4948/01 Amended Decision and Order, at 9, 10 (N.Y. Sup. Ct. Monroe Co., August 14, 2006) ("Jasco II"). In the meantime, the Lawsuit remained pending against Dana; in December 2005, Jasco served on Dana a third notice to produce documents ("Third Document Demand").

In March 2006, Dana and 40 of its subsidiaries (collectively "Dana" or the "Debtors") filed in the bankruptcy court a petition for reorganization under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 1101-74. Dana had not produced any documents in response to Jasco's Third Document Demand, objecting on various grounds; and the effect of Dana's Chapter 11 petition was to stay the proceedings against Dana in Jasco's state-court action, see 11 U.S.C. § 362(a)(1).

C.  Proceedings in the Bankruptcy Court

In September 2006, based on the causes of action asserted against Dana in the pending state-court action, Jasco filed in the bankruptcy court a $20 million proof of claim (the "Claim") against Dana's estate.  On August 31, 2007, Dana filed an objection, seeking an order "disallowing and expunging the Jasco Claim."  (Objection of Debtors and Debtors in Possession Seeking To Disallow Claim of Jasco Tools, Inc. ("Dana Objection" or "Objection"), ¶ 16.)  Noting that Rule 56 of the Federal Rules of Civil Procedure is applicable to contested claims in bankruptcy proceedings, see Fed. R. Bankr. P. 7056, Dana asserted that there was no genuine dispute as to any material fact and that Dana was entitled to summary judgment dismissing the Jasco Claim.  (See Dana Objection ¶¶ 19-20.)  It contended that although Jasco's theory was that Dana had conspired with Rogers, Zicari, and Convertino to, inter alia, misappropriate Jasco's trade secrets and unjustly enrich itself, Jasco had failed, even after nearly four years of discovery, to turn up any evidence of a conspiracy to which Dana was a party or any evidence that Dana had knowledge of the alleged theft of Jasco's trade secrets.  (See id. ¶¶ 30-33.)

Responding to the Dana Objection on September 20, 2007, Jasco contended, inter alia, that additional discovery was needed, pointing out that Dana had never provided any documents in response to Jasco's Third Document Demand (which was attached to

the Baldino Declaration as Exhibit P), which Jasco described as seeking "only a handful of documents" (Response to Debtors' Objection to Claim of Jasco Tools, Inc. ("Jasco Response" or "Response"), ¶ 8). Jasco's Response also stated that it had been

> made clear to counsel for Dana, both before and since the bankruptcy filing, [that] Jasco needs some additional limited discovery in the underlying action, such as the deposition of one or two additional Dana employees, before the case is ready either for a dispositive motion or a plenary trial, if necessary.

> . . . .

> 13.  The bottom line is that Dana has refused to provide some basic documents necessary to demonstrate Dana's culpability in the underlying action and to rebut Dana's allegations in its summary judgment motion.  Facts essential to justify Jasco's opposition to any summary judgment motion by Dana cannot now be presented by Jasco, because Dana refuses to turn over documents within its possession and control necessary to rebut Dana's allegations.

> 14.  Therefore, to the extent that the instant Objection is the equivalent of a summary judgment motion, the Objection must be denied, pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, made applicable hereto by Rule 7056 of the Federal Rules of Bankruptcy Procedure.

(Id. ¶¶ 11, 13-14; see also id. ¶ 10 ("Dana has never produced a single document in response to Jasco's Third [Document Demand], which has been pending since December 27, 2005.").)

As discussed further in Part II.A.1. below, Jasco also contended that Dana's motion for summary judgment should be denied on the merits, arguing that there were genuine issues of material fact to be tried as to each of Jasco's causes of action against Dana, and pointing out that the existence of such a genuine issue as to even one of Jasco's causes of action sufficed to defeat

- 13 -

Dana's request that the Jasco Claim be dismissed as a matter of law. (See Jasco Response ¶¶ 15-43.)

Accompanying the Jasco Response was Baldino's September 19, 2007 Declaration, parts of which are quoted in Part I.A. above. Baldino stated that "[o]f all the defendants in the state court action, Dana has been the least forthcoming during the discovery process" (Baldino Decl. ¶ 41) and that "Dana employees submitted a number of affidavits to the state court that subsequent testimony and documentation has proven to be perjured" (id. ¶ 42). Examples given by Baldino included the state-court affidavits of Haybach and Blanchard (quoted in Part I.A. above) stating that they had begun seeking a new supplier for the parts covered by the Purchase Agreement only after the breakdown of negotiations between Dana and Jasco on December 3, 1999, whereas documents reveal (a) that in fact Haybach had instructed Buss to send bid materials to Nationwide on September 30, 1999, informing Buss that Nationwide orally, through Zicari, had already promised a 10% discount from Jasco prices; and (b) that Nationwide had given its written proposal to Dana, addressed to Blanchard, on November 26, 1999. (See id. ¶¶ 45-49; id. Exhibits C, D, F.)

In addition, the Baldino Declaration attached copies of Haybach's personal calendar for October and November, which revealed several face-to-face meetings between Dana and Nationwide prior to December 3. (See Baldino Decl. Exhibit D.) At one of the November meetings, Nationwide, represented by Ricotta, Nuccitelli, Zicari, and Convertino, made a "PowerPoint" slides

presentation to Dana. (See Baldino Decl. Exhibit E.) The presentation stated, inter alia, that Nationwide "has assessed this program with employees who have been intimately knowledgeable with this program"; that Nationwide's goal was to "[s]ave Dana an average of $1 million, net per year"; and that Nationwide's "[e]stimates of current machining cycles (costs) were based on review of representative prints as well as past experience with program[.]" (Id. (emphases added).) Baldino characterized these statements as to Nationwide's knowledge and experience as "bragg[ing]" (Baldino Decl. ¶ 21) and pointed out that Nationwide "had almost no prior experience machining these types of cast iron parts" (id. ¶ 19).

Baldino also observed that Buss, at his deposition, denied having any contact with Rogers after Rogers retired from Jasco, that that denial was belied by the records of calls by Rogers that Jasco had obtained from the telephone company, and that, when confronted with the records and asked about his lengthy conversations with Rogers, Buss stated that he did not remember the calls. (See id. ¶¶ 31-32, 51.) Pointing out that at the time of Dana's bankruptcy filing Dana had failed to provide any documents in response to Jasco's Third Document Demand, Baldino stated that, "[g]iven the tendency of Dana employees to lie under oath, as demonstrated by their affidavits, and given their forgetfulness, as demonstrated at their depositions, it is absolutely vital to obtain Dana's paper and electronic records to demonstrate what actually happened." (Id. ¶ 52.)

Dana submitted a reply to Jasco's Response to Dana's Objection, reiterating many of the arguments made in the Dana Objection. (See Reply in Support of the Objection of [Dana] Seeking To Disallow Claim of Jasco Tools, Inc. ("Dana Reply," "Reply," or "Debtors' Reply"), ¶¶ 1-28.) It stated, inter alia, that

> [t]he Jasco Claim seeks an unproven and unwarranted sum of $20 million because Jasco is upset with a decision by Dana seven years ago to let the parties' Purchase Agreement expire under its terms and resource the business with a new supplier. . . . Jasco's response . . . fails to rebut the arguments raised in Dana's Objection and seeks to delay a decision by a contrived request for more time to conduct further, unnecessary discovery . . . .

(Dana Reply ¶ 1 (emphasis in original)). Attaching excerpts from the depositions of Zicari and Nationwide's president Ricotta, the Dana Reply argued that

> Jasco failed to put forth any evidence to support its purely speculative accusation that Dana knew that Nationwide, through Messrs. Convertino or Zicari, misappropriated Jasco's trade secrets. The reason for this omission is simple: each of the principal witnesses denied knowledge of anyone ever telling Dana of the alleged conversion. Mr. Zicari denied ever advising Dana that "anyone from Nationwide was using stolen information from Jasco to put together the bid that Nationwide ultimately presented." (Zicari Dep., Reply Ex. A at 620-1.) Mr. Convertino also denied ever telling anyone at Dana that Nationwide prepared its bid using stolen information from Jasco. (Convertino Dep., Obj. Ex. I at 1764-1765.) . . . . Mr. Haybach from Dana also testified that no one ever informed him of the use of stolen information in Nationwide's bid. (Haybach Dep., Obj. Ex. G at 526-527.) In short, Jasco offers no evidence connecting Dana to the alleged conspiracy because none exists.

(Dana Reply ¶ 9 (emphases added); see also id. ¶ 13 ("Nationwide's president, Ronald Ricotta, testified that Nationwide could offer a

- 16 -

10% price cut without the benefit of allegedly stolen information. (Ricotta Dep., Reply Ex. C at 149-152.)" (emphasis in Reply)).)

The Dana Reply also stated, inter alia, that "[i]n its Response, Jasco never attempts to explain why, after having nearly four years to conduct discovery in the underlying Lawsuit, it has not had a sufficient opportunity to present its case" (Dana Reply ¶ 25), and described Jasco's claim of need for additional discovery as "contrived" (id. ¶ 27). The Reply attached the as-of-then-unreversed decision of the state court in Jasco II, which had granted summary judgment to Rogers with the statement that Jasco's contention that it needed additional discovery "rings hollow in view of the Nationwide employees and representatives" already deposed, Jasco II at 10.

An initial status conference on the Dana Objection to the Jasco Claim was held on October 17, 2007, and the bankruptcy court scheduled argument on Dana's summary judgment request for October 31, 2007. The court noted that in an October 15, 2007 letter, Jasco had, inter alia, complained of insufficient notice that the Dana Objection itself was to be treated as a summary judgment motion and of Dana's failure to provide a separate statement, as required by Local Bankruptcy Rule 7056-1(b), setting out the material facts that Dana contended were not genuinely in dispute. The court ordered Dana to file such a statement on October 24, 2007; and it ordered Jasco to file--on the same date--a statement of material facts that it contended were genuinely in dispute. (See Bankruptcy Court Hearing Transcript, October 17, 2007, at

- 17 -

94-97.) Although the court told Jasco's counsel, "if you want further time to submit the counter designation and augment your papers on a very brief basis, I'm perfectly happy to do that" (id. at 94), it ultimately stated to Dana's counsel that "within one week I expect that there will be a [7056-1] statement served," and that Jasco's Rule 7056-1 statement should be filed "promptly thereafter, although [Jasco's counsel] probably doesn't need to see [Dana's] before he comes up with his own, because those statements are really parochial in form and type" (id. at 97).

Dana and Jasco submitted their Rule 7056-1 statements on October 24, 2007. Jasco, in addition to narrating the facts that it contended were genuinely in dispute (see Rule 7056-1(c) Statement of Jasco Tools, Inc., ¶¶ 3-6), made a blanket denial of all material facts asserted in Dana's Rule 7056-1 statement (see id. ¶ 1), complaining that the order that both parties' Rule 7056-1 statements be submitted simultaneously left Jasco "no choice but to assert that each material fact set forth in Dana's Statement is in fact controverted" (id. ¶ 1 n.1). The summary judgment motion was argued as scheduled on October 31.

D. The Grant and Affirmance of Summary Judgment Against Jasco

In its November 6, 2007 Decision, the bankruptcy court denied Jasco's request for additional discovery and granted Dana's motion for summary judgment. In denying discovery, the court stated principally as follows:

> Prior to the chapter 11 petition date, the parties had nearly four years to conduct discovery. Since

- 18 -

> the petition date, the Lawsuit has been stayed as to Dana, but Jasco and the remaining defendants, Nationwide and Messrs. Rogers and Zicari, continued to conduct depositions. The State Court severed Jasco's claim against Mr. Rogers from Jasco's claim against Dana. Ultimately Mr. Roger[s] successfully moved for summary judgment, and Jasco settled with Nationwide and Messrs. Zicari and Convertino. On September 15, 2006, Jasco filed its proof of claim in this Court.
>
> . . . .
>
> Jasco claims it needs more discovery before the case is ready for a dispositive motion. However, before the Jasco Lawsuit was stayed, Jasco had nearly four years to conduct discovery. The discovery efforts included 18 depositions, some lasting for several days. Among them Jasco deposed three Dana employees, taking five days to do so. In addition Dana responded to interrogatories and two notices to produce providing voluminous documentation.

Bankruptcy Court Decision, 2007 WL 3376882, at *2, *4. The bankruptcy court noted that Jasco's contention that it needed additional discovery had been rejected by the state court in Jasco II as speculative, and the bankruptcy court adopted that view:

> Jasco made a similar argument in response to Mr. Rogers'[s] motion for summary judgment in the Lawsuit in July 2006, claiming that it needed to conduct in excess of a dozen depositions of Nationwide employees and depositions of Mr. Roger[s]'s wife and girlfriend. The State Court found that Jasco's cry for additional discovery "rings hollow" concluding that Jasco "offers nothing but mere hope and speculation" that additional discovery would reveal evidence to prove the alleged conspiracy. See Jasco Tools, Inc. v. Rogers, Index No. 4948/01 Amended Decision and Order, at 9, 10 (N.Y. Sup. Ct. August 14, 2006). I find similarly that Jasco's continuing requests for discovery at this stage are meritless.

Bankruptcy Court Decision, 2007 WL 3376882, at *5 (emphases added).

- 19 -

In finding that there were no genuine issues of material fact to be tried as to Jasco's claim that Dana had breached the agreement to negotiate in good faith with respect to a possible extension of the Purchase Agreement, the bankruptcy court stated, inter alia, that "a mere agreement to agree is unenforceable," id. at *5 (internal quotation marks omitted), and that Dana had "listed Jasco as one of its worst suppliers in terms of product non-conformities during its performance of the Agreement and thus it made perfect sense for Dana to consider its alternatives," id. at *6. In finding that there was no evidence to support Jasco's contention that Dana was a party to a conspiracy to misappropriate Jasco trade secrets and to unjustly enrich the coconspirators, the court stated as follows:

> Jasco's claim is based upon an alleged conspiracy between Dana and Nationwide and Messrs. Rogers, Zicari and Convertino to steal and use Jasco information in order to replace Jasco with Nationwide as the supplier to Dana. However, despite the allegations with respect to Nationwide and Jasco's former employees, there is no evidence connecting Dana to the alleged conspiracy. The fact that Dana knew that Messrs. Zicari and Convertino became Nationwide employees is not probative of a conspiracy or proof of trade secret misappropriation. Nationwide's employment of individuals who had worked with Dana and knew Dana's business is conduct consistent with permissible business competition. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 597 and n.21 . . . (1986) ("conduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy.")[.]
>
> Mr. Baldino's affidavit claiming that Nationwide bragged to Dana about information it had stolen from Dana is not based upon personal knowledge. The PowerPoint presentation stating that Nationwide had employees who were "intimately knowledgeable with

- 20 -

> [the Dana] program" simply acknowledges the fact that
> experienced former Jasco employees would be involved
> with a Nationwide-Dana relationship. An employee's
> knowledge and experience is not considered a trade
> secret.

Bankruptcy Court Decision, 2007 WL 3376882, at *7 (quoting Baldino Decl. Exhibit E) (emphases ours). The bankruptcy court also agreed with the Jasco II court's assessment of the evidence, stating,

> [s]imilarly, as the State Court found in granting
> summary judgment in favor of Mr. Rogers [in
> Jasco II], the evidence of telephone calls between
> former Jasco employees and Dana employees "does not
> (even given every available inference that might
> justifiably be drawn in favor of the plaintiff)
> salvage plaintiff's position."

Bankruptcy Court Decision, 2007 WL 3376882, at *7 (quoting Jasco II at 5).

On November 9, 2007, three days after the bankruptcy court issued its Decision, Jasco II was reversed. The Appellate Division stated that

> because plaintiff established that discovery has yet
> to be completed, Supreme Court erred in granting the
> subsequent motion of Rogers in part, granting Rogers
> summary judgment dismissing the complaint against him
> . . . ; see generally CPLR 3212[f]). Indeed,
> plaintiff established that it requires further
> document discovery and must depose or complete the
> depositions of additional witnesses.

Jasco III, 45 A.D.3d at 1296-97, 844 N.Y.S.2d at 811 (emphasis added).

On November 16, 2007, the bankruptcy court entered its Order Disallowing Claim of Jasco Tools, Inc. [and denying other requested relief not relevant here] ("November 16 Order" or "Order"), stating that Jasco's Claim "is disallowed and expunged

in its entirety," id. at 3. The Order stated that the court had reviewed, inter alia, "the Objection, the Jasco Response, the Debtors' Reply, the [Jasco] October 15th Letter, the Debtors' Statement of Undisputed Facts, [and] Jasco's Statement of Undisputed [sic] Facts," and that the court had

> determined that the legal and factual bases set forth in the Objection, the Debtors' Reply, [and] the Debtors' Statement of Undisputed Facts and the Debtors' Response to Abstention Motion and at the Hearing establish just cause for the relief granted herein.

Id. at 2 (emphases added).

Jasco appealed to the district court, arguing the merits of the bankruptcy court's Decision and pointing out that Jasco II, on which the Decision in part relied, had been reversed. In an Order dated May 9, 2008 ("District Court Order"), the district court affirmed the bankruptcy court's Decision. With respect to Jasco's request for discovery, the district court ruled that

> Jasco has not shown that the Bankruptcy Court abused its discretion in concluding that additional discovery "at this stage [is] meritless," as "Jasco had [had] nearly four years to conduct discovery," during which Jasco took "18 depositions" and received "voluminous documentation" from Dana.

Id. at 5-6 (quoting Bankruptcy Court Decision, 2007 WL 3376882, at *4-*5). The district court did not mention that only three of the 18 depositions were taken of employees of Dana. As to the merits, the district court found no error, quoting the Decision's rationale. See, e.g., District Court Order at 6-7.

This appeal followed.

## II. DISCUSSION

On appeal, Jasco argues principally that summary judgment was inappropriate because Jasco should have been allowed to complete discovery of Dana and because there were genuine issues of fact to be tried. Jasco also protests the bankruptcy court's procedures leading to the grant of summary judgment, contending (a) that treating the Dana Objection as a motion for summary judgment allowed Dana to get away with a "bait and switch procedure" (Jasco brief on appeal at 7, 25); (b) that giving the parties only two weeks from the date of the initial status conference "to argue the non-existent summary judgment motion" denied Jasco due process (id. at 7, 26, 27); (c) that allowing Dana to move for summary judgment without a supporting "[a]ffidavit" or "other sworn statement," and without "evidence in admissible form," ignored the requirements for summary judgment (id. at 29); and (d) that requiring that the Rule 7056-1 statements be served simultaneously made it impossible for Jasco actually to respond to Dana's assertions as to what facts were not genuinely in dispute (see id. at 26-27).

On an appeal from the district court's affirmance of a bankruptcy court's order, we review the decision of the bankruptcy court independently, assessing its conclusions of law de novo and its factual findings for clear error. See, e.g., In re Wireless Data, Inc., 547 F.3d 484, 492 (2d Cir. 2008); In re First Central Financial Corp., 377 F.3d 209, 212 (2d Cir. 2004). The bankruptcy

court's discretionary rulings with regard to such matters as scheduling and continuances are reviewed for abuse of discretion. See, e.g., In re Lehal Realty Associates, 101 F.3d 272, 276 (2d Cir. 1996). An abuse of discretion may consist of an error of law or a clearly erroneous finding of fact, see, e.g., Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990), or a decision that, "though not necessarily the product of a legal error or a clearly erroneous factual finding[, ]cannot be located within the range of permissible decisions," Zervos v. Verizon New York, Inc., 252 F.3d 163, 169 (2d Cir. 2001).

For the reasons that follow, we find merit in Jasco's principal contentions, i.e., that Jasco should have been allowed additional discovery and that on the present record, viewed in the light most favorable to Jasco, summary judgment dismissing at least one of Jasco's causes of action was inappropriate. We pause first, however, to address Jasco's other procedural complaints, in which we find limited merit.

A.  Jasco's Challenges to the Summary Judgment Procedures

    1.  The Claimed Summary Judgment Surprise

Jasco argues that Dana's use of its Objection to seek judgment as a matter of law without filing a separate summary judgment motion constituted a "bait and switch procedure" that disadvantaged Jasco because Jasco did not understand that it was responding to a summary judgment motion, rather than merely being

given notice that Dana would move for summary judgment in the future. (Jasco brief on appeal at 7, 25-26.) We are unpersuaded.

Although Dana's Objection was not labeled a motion for summary judgment and was not accompanied by a separate statement of undisputed facts as required by S.D.N.Y. Bankr. R. 7056-1(b), the Objection explicitly requested summary judgment. It set out the criteria for granting a motion for summary judgment (see Dana Objection ¶ 19), citing Celotex Corp. v. Catrett, 477 U.S. 317 (1986), and Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ("Liberty Lobby"), and stated that "[f]or the reasons set forth below, the Debtors are entitled to summary judgment in their favor" (Dana Objection ¶ 20 (emphasis added)). There followed a section entitled "III. **Material Undisputed Facts of the Jasco Claim**," followed by Dana's assertions as to the facts surrounding the Purchase Agreement (see id. ¶¶ 21-22), the December 1999 negotiations for an extension of that Agreement (see id. ¶¶ 23-24), the actions of Rogers, Zicari, and Convertino (see id. ¶¶ 25-26), the bid by Nationwide (see id. ¶¶ 27-29), and the discovery conducted in Jasco's state-court action (see id. ¶¶ 30-33). These paragraphs were followed by a section entitled "**IV. Dana's Summary Judgment Arguments**," with paragraphs repeatedly asserting, inter alia, that Dana had never been told that Nationwide was using or had used Jasco trade secrets, and that Jasco lacked evidence to prove its causes of action (see id. ¶¶ 34-58). Dana's Objection repeatedly stated that Dana was

seeking "summary judgment" (e.g., ¶¶ 19, 20, 59, 60) or "judgment as a matter of law" (e.g., ¶¶ 6, 63).

The fact that the Dana Objection itself requested summary judgment was not lost on Jasco. To be sure, Jasco's Response began with protests (a) against Dana's effort to have Jasco's $20 million Claim summarily dismissed without, as required by an earlier procedural order of the bankruptcy court ("Procedural Order"), submitting an "'affidavit, declaration or verification in support of the relief requested'" (Jasco Response ¶¶ 2-3 (quoting Procedural Order)), and (b) against Dana's efforts to cut off Jasco's right to discovery despite Dana's failure to produce any documents pursuant to Jasco's outstanding Third Document Demand, which had been pending in the state-court action since 2005 (see, e.g., Jasco Response ¶¶ 5-13). But the next 30 paragraphs of the Jasco Response addressed the merits of Dana's request for summary judgment.

First, Jasco stated that Dana's request for relief should be denied pursuant to Fed. R. Civ. P. 56(f) (dealing with the need for discovery) "to the extent that the instant Objection is the equivalent of a summary judgment motion." (Id. ¶ 14.) There followed a section entitled "**Dana's Motion for Summary Judgment must be Denied on the Merits**," with a discussion of the legal standard for granting summary judgment (see id. ¶ 15)--quoting a case citing Celotex and Liberty Lobby--and an introductory paragraph stating that

> [t]here are four different causes of action alleged against Dana in the underlying state court action.

> As will be shown below, Dana is not entitled to summary judgment with respect to any of these four causes of action. Of course, as long as any one cause of action survives Dana's summary judgment motion, the Debtors' Objection must be dismissed

(Jasco Response ¶ 16 (emphases added)). The ensuing paragraphs discussed the substantive law governing, and the evidence to support, Jasco's breach of contract cause of action (see id. ¶¶ 17-29), its trade secret misappropriation cause of action (see id. ¶¶ 31-34), its unjust enrichment cause of action (see id. ¶¶ 36-38), and its cause of action for prima facie tort (see id. ¶¶ 40-42). As to these claims, Jasco concluded that:

> [a]t a minimum, there are genuine issues of material fact concerning Dana's alleged breach of contract which require denial of Dana's motion for summary judgment upon this cause of action

(id. ¶ 30);

> [a]t a minimum, the facts set forth in the Baldino Declaration and in the Exhibits annexed thereto raise genuine issues of material fact concerning Dana's [trade secret misappropriation], which require denial of Dana's motion for summary judgment upon this cause of action

(id. ¶ 35);

> [a]t a minimum, there is a genuine issue of material fact concerning Dana's unjust enrichment, which requires denial of Dana's motion for summary judgment upon this cause of action

(id. ¶ 39); and

> [a]t a minimum, the facts raise genuine issues of material fact concerning Dana's actions which require denial of Dana's motion for summary judgment upon [Jasco's prima facie tort] cause of action

(id. ¶ 43). We conclude that Jasco's contention that it was disadvantaged in responding to Dana's Objection because it

- 27 -

believed that that Objection was not a summary judgment motion but only a precursor to such a motion is meritless.

2. The Claimed Denial of Due Process

Nor is there merit in Jasco's contention that the bankruptcy court's scheduling of oral argument on Dana's summary judgment motion, to take place just two weeks after the initial status conference, denied Jasco due process. Rule 56 of the Federal Rules of Civil Procedure, which "applies in adversary proceedings" in the bankruptcy court, Fed. R. Bankr. P. 7056, allows a motion for summary judgment to be served "10 days before the day set for the hearing." Fed. R. Civ. P. 56(c). Given (a) that the Dana Objection explicitly requesting summary judgment was served on Jasco on August 31, 2007, (b) that Jasco responded in detail on September 20, (c) that the bankruptcy court made it clear beyond peradventure at the October 17 status conference that the court was treating Dana's Objection as a summary judgment motion, (d) that the October 31 date for the hearing on the motion was announced at that October 17 conference, and (e) that the hearing was held on October 31, Jasco's due process argument borders on the frivolous.

3. The Absence of Affidavits

Jasco also complains that the bankruptcy court allowed Dana to move for summary judgment without the support of an affidavit, declaration, or other sworn verification. The

- 28 -

requirement for such a sworn statement--which Dana asked the bankruptcy court to waive, in light of the fact that Dana supported most of its factual allegations with citations to depositions, i.e., to sworn testimony (see Dana Objection ¶ 65)-- was included in the bankruptcy court's Procedural Order. Rule 56, however, imposes no such requirement. It provides that a party against which relief is sought may move for summary judgment "at any time, with or without supporting affidavits." Fed. R. Civ. P. 56(b) (emphasis added). Thus, in Celotex, the Supreme Court found that as to a summary judgment motion based on the absence of evidence to prove an element of an opponent's cause of action, there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials," 477 U.S. at 323; "where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file," id. at 324 (internal quotation marks omitted).

In support of its contention that Jasco possessed no proof that Dana had participated in the alleged conspiracy to use Jasco's misappropriated trade secrets, Dana relied principally on deposition excerpts that it attached to its Objection. Reliance on such sworn statements--though they do not warrant the granting of the motion if there is a question as to the weight to be given them or as to the witnesses' credibility (see Part II.C.2. below)- -was not foreclosed by Rule 56; and the bankruptcy court had

discretion, as to which we see no abuse here, to relax the sworn-statement requirement set out in its Procedural Order.

### 4. The Requirement for Simultaneous Rule 7056-1 Statements

We find greater merit in Jasco's contention that it was inappropriate for the bankruptcy court to order that Jasco and Dana serve their Rule 7056-1 statements simultaneously. The purpose of the summary judgment mechanism is to allow the prompt resolution of actions in which there is no genuinely disputed issue as to any material fact. In aid of this purpose, the pertinent local rule provides that a party moving for summary judgment must annex to its motion "a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." S.D.N.Y. Bankr. R. 7056-1(b). One purpose of requiring the movant to submit such a statement is to provide its opponent with notice as to the moving party's factual contentions. Another is to provide a precise framework for responses that will reveal to the court which material facts are, and which are not, actually in dispute. In aid of the latter purpose, the local rule requires a party opposing summary judgment to include a statement with "correspondingly numbered paragraph[s] responding to each numbered paragraph in the statement of the moving party," id. Rule 7056-1(c); and it provides that each assertion by the moving party in its Rule 7056-1(b) statement that is not "specifically controverted by a correspondingly numbered paragraph in the

statement required to be served by the opposing party" as provided by Rule 7056-1(c) "shall be deemed admitted," id. Rule 7056-1(d).

In the present case, the bankruptcy court ordered the simultaneous service of Rule 7056-1 statements, stating that Jasco did not need to see Dana's Rule 7056-1 statement before serving its own because Dana's Objection and Jasco's Response had expounded at length on the parties' respective positions as to why summary judgment was or was not appropriate. But while Jasco may not have needed further notice as to Dana's positions, the order for simultaneous service of the Rule 7056-1 statements made it impossible for Jasco to "respond[]" point-by-point as required by Rule 7056-1(c), and Jasco therefore sought to protect itself against any inadvertent "deemed admi[ssion]" pursuant to Rule 7056-1(d) by stating a wholesale denial of all of Dana's assertions. The result of the court's order was an exercise that, contrary to the purpose of Rule 7056-1, was of no apparent benefit to the parties and disserved the interest of the court in achieving specific identification of any factual issues that were not really in dispute.

We would be inclined to view the error of requiring the simultaneous service of the Rule 7056-1 statements as harmless if there were no indication that the bankruptcy court deemed any Dana assertion admitted for lack of the requisite Jasco Rule 7056-1(c) response. However, while the Bankruptcy Court Decision did not state that it deemed any of Dana's assertions admitted by Jasco, the court's November 16 Order ruled that Dana's right to summary

judgment was "establish[ed]" by "the legal and factual bases set forth in the [Dana] Objection, the [Dana] Reply, [and] the [Dana] Statement of Undisputed Facts." Bankruptcy Court November 16 Order at 2 (emphasis added). Since it is not clear how the bankruptcy court could validly have considered the facts to have been "established" by Dana's assertions, given that Jasco denied them, it is not clear that Jasco was not prejudiced by the bankruptcy court's order that the Rule 7056-1 statements be served simultaneously.

In any event, we view the bankruptcy court's conclusion-- i.e., that Dana's submissions established facts that demonstrated its entitlement to dismissal of all of Jasco's causes of action as a matter of law--as an aspect of the court's flawed application of well established summary judgment principles, which we discuss in Part II.C. below.

B. Jasco's Request for Additional Discovery

Rule 56 provides that if a party opposing a summary judgment motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may, inter alia, deny the summary judgment motion or order a continuance to allow the opposing party to obtain affidavits, take depositions, or conduct other discovery that is material to its opposition to the motion. See Fed. R. Civ. P. 56(f); see, e.g., Paddington Partners v. Bouchard, 34 F.3d 1132, 1137 (2d Cir. 1994). A court plainly has discretion to reject a request for

discovery if the evidence sought would be cumulative or if the request is based only on "speculation as to what potentially could be discovered," id. at 1138; and a bare assertion that the evidence supporting plaintiff's allegations is in the hands of the moving party is insufficient to justify the denial of summary judgment, see id. But a party against which summary judgment is sought must be afforded "a reasonable opportunity to elicit information within the control of his adversaries." Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980) ("Quinn") (summary judgment should not be granted against nondilatory party who has been "denied reasonable access to potentially favorable information").

In the present case, Jasco sought compliance with its outstanding document demand in order to be able to respond more fully to Dana's contention that Dana had no knowledge of the misappropriation of Jasco's trade secrets. The bankruptcy court rejected that request, stating that, despite the fact that Jasco had had nearly four years to conduct discovery in the state-court action, see Bankruptcy Court Decision, 2007 WL 3376882, at *4, "there is no evidence connecting Dana to the alleged conspiracy," id. at *7. The court stated that Jasco had taken 18 depositions, including three of Dana employees; that Dana had responded to interrogatories and two notices to produce, providing voluminous documentation; and that Jasco had made a request for additional discovery in the state-court action in opposition to a summary judgment motion by Rogers, a request that the state court found

- 33 -

"'r[ang] hollow,'" viewing it as being based on "'nothing but mere hope and speculation' that additional discovery would reveal evidence to prove the alleged conspiracy," id. at *5 (quoting Jasco II at 10). The bankruptcy court stated that its own conclusion was "similar[]." Bankruptcy Court Decision, 2007 WL 3376882, at *5. Dana, in addition to endorsing the bankruptcy court's rationale, contends that we should reject Jasco's challenge to the denial of discovery on the grounds that Jasco failed to submit a Rule 56(f) affidavit in support of its discovery request (see Dana brief on appeal at 16-17) and "failed to identify the individuals it wished to depose or explain how these depositions would impact the material legal issues in this case" (id. at 16). We conclude that none of these rationales permitted the grant of summary judgment in the face of Jasco's request for discovery.

First, the bankruptcy court's intimation that Jasco had conducted extensive discovery in the state-court action failed to focus sufficiently on the discovery that had been obtained from Dana. Discovery from parties other than Dana could have elicited evidence that Dana was a knowing participant in a tortious misappropriation or use of Jasco trade secrets; but when the state of a defendant's knowledge is a material issue, discovery from others may well not be an adequate substitute for depositions of the defendant who professes ignorance. As to Dana itself, as the bankruptcy court noted, Jasco had taken only three depositions, consuming a total of only five days. With respect to a suit

seeking $20 million in damages for, _inter alia_, an alleged trade secret misappropriation conspiracy--hardly a fanciful allegation, given Convertino's sworn statements, see Parts I.A. above and II.C.1. below--in which, given the documents in the record, Dana could be found to have taken part in various ways and at various times, see, e.g., _Bichler v. Eli Lilly & Co._, 55 N.Y.2d 571, 580, 450 N.Y.S.2d 776, 780 (1982) (on a concerted action theory, a joint tort-feasor may be held liable for furthering a common plan or design to commit a tort if it knowingly "lend[s] aid or encouragement to the wrongdoer, or ratif[ies] and adopt[s] [the tortfeasor's] acts done for [its] benefit" (internal quotation marks omitted)), five days of depositions cannot reasonably be viewed as extensive.

Second, the various discovery methods are more complementary than fungible. For example, documents or interrogatory answers may help to identify persons with knowledge of the pertinent events, so that those persons may be deposed; depositions, at which there can be cross-examination, may serve to clarify statements in documents that are ambiguous; and deposition testimony may be shown to have been false after documentary evidence is obtained. No one type of discovery is necessarily an adequate substitute for another. Here, where Jasco's trade secret misappropriation cause of action against Dana is based on an alleged conspiracy, a type of agreement that is by its nature secretive, responses to interrogatories and document demands do not necessarily obviate the need for depositions of persons

believed to have knowledge relevant to the alleged secret agreement.

The bankruptcy court gave no explanation as to why Jasco's prior discovery of Dana sufficed. The Decision contained no substantive comparison of what had been produced with what is now requested and no finding that Jasco's Third Document Demand sought information that was cumulative or that it was otherwise unduly burdensome. Nor was there a finding that Jasco's discovery request was dilatory--a finding that would have been untenable, given that the document demand Jasco seeks to pursue was served in December 2005 and that its pursuit was stalled by Dana's March 2006 bankruptcy petition. And to the extent that the bankruptcy court's adoption of the Jasco II court's view--i.e., that Jasco's discovery requests were based on "'nothing but mere hope and speculation'"--may be deemed a ruling that Jasco's request called for documents that were not reasonably calculated to lead to admissible evidence, see Fed. R. Civ. P. 26(b)(1), the bankruptcy court's reliance on Jasco II is doubly flawed. First, Jasco II was reversed (after issuance of the bankruptcy court's Decision, but prior to the issuance of the November 16 Order dismissing Jasco's Claim). Second, the Jasco II court was dealing with Jasco's proposed depositions of Nationwide employees, Zicari's wife and father-in-law, and Rogers's wife and girlfriend, see Jasco II at 10, not with the Third Document Demand or any other request for discovery from Dana.

Finally, we reject the additional arguments advanced by Dana. First, its contention that we should affirm the denial of discovery on the ground that Jasco failed to submit a Rule 56(f) affidavit exalts form over substance. Jasco's Response to Dana's Objection was accompanied by the Baldino Declaration. As that Declaration was submitted "under penalties of perjury" (Baldino Decl. ¶ 54), it was plainly the equivalent of an affidavit. Second, although not labeled a "Rule 56(f)" affidavit, the Declaration gave specific reasons for Jasco's need for discovery. It stated that Dana had refused to comply with Jasco's outstanding document demand--which was attached to the Declaration as Exhibit P--and that Jasco needed to obtain the requested documents from Dana in light of the instances in which Dana employees had "lie[d] under oath, as demonstrated by their affidavits, and given their forgetfulness, as demonstrated at their depositions." (Id. ¶ 52.) Finally, although Dana argues that Jasco "failed to identify the individuals it wished to depose or explain how these depositions would impact the material legal issues in this case" (Dana brief on appeal at 16), Jasco's counsel had informed Dana's counsel in a July 30, 2007 e-mail--which also was attached to the Baldino Declaration--that Jasco wanted to depose "one or two" of the Dana employees who were "most centrally involved in the project" "that is the subject of this lawsuit," and that Jasco needed responses to ¶¶ 11-13 of the Third Document Demand in order to identify those persons (Baldino Decl. Exhibit O). In sum, the

Baldino Declaration sufficed as an affidavit providing the information contemplated by Rule 56(f).

Given, _inter alia_, the scant extent of the depositions conducted of Dana employees, the dearth of analysis by the bankruptcy court of the 2005 Third Document Demand, the bankruptcy court's reliance on _Jasco II_ which concerned discovery only of parties other than Dana, the sworn statements by Convertino indicating that a trade secret misappropriation conspiracy existed, the evidence of false and questionable sworn statements by Dana employees as to the origin of Dana's dealings with Nationwide, and the fact that any attempt by Jasco to compel compliance with its December 2005 discovery request was foreclosed by Dana's March 2006 bankruptcy filing, we conclude that the bankruptcy court's denial of Jasco's discovery request was not within the range of permissible decisions.

C. The Misapplication of Summary Judgment Principles

Finally, we conclude that even without discovery of additional evidence, the record as it stands was sufficient to preclude the entry of summary judgment dismissing and expunging the Jasco Claim. "[S]ummary judgment is a useful device for unmasking frivolous claims and putting a swift end to meritless litigation"--when "properly employed." _Quinn_, 613 F.2d at 445. A motion for summary judgment may properly be granted--and the grant of summary judgment may properly be affirmed--only where there is no genuine issue of material fact to be tried, and the facts as to

- 38 -

which there is no such issue warrant judgment for the moving party as a matter of law. See Fed. R. Civ. P. 56(c); see, e.g., Madonna v. American Airlines, Inc., 82 F.3d 59, 61 (2d Cir. 1996). The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists. See, e.g., Liberty Lobby, 477 U.S. at 249-50. "[W]hen the party against whom summary judgment is sought comes forth with affidavits or other material obtained through discovery that generates uncertainty as to the true state of any material fact, the procedural weapon of summary judgment is inappropriate." Quinn, 613 F.2d at 445. Summary judgment is inappropriate when the admissible materials produced in opposition to the summary judgment motion "make it arguable" that the claim has merit. Id. Thus, Rule 56 authorizes summary judgment only "where the moving party is entitled to judgment as a matter of law" on the basis that "no genuine issue remains for trial" because "it is quite clear what the truth is." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467 (1962) (internal quotation marks omitted).

The principles governing a court's assessment of whether a genuine issue of material fact exists are the same whether that question arises in the context of a motion for summary judgment or of a motion for judgment as a matter of law during or after trial, see, e.g., Liberty Lobby, 477 U.S. at 250-51; Eastman Machine Co. v. United States, 841 F.2d 469, 473-74 (2d Cir. 1988), and these

- 39 -

principles are well established. In considering whether there is sufficient evidence to create a genuine issue of fact, the district court may not properly consider the record in piecemeal fashion, giving credence to innocent explanations for individual strands of evidence; rather, it must "review all of the evidence in the record," Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000) (discussing propriety of judgment as a matter of law after trial). "In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. . . . 'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" Id. at 150-51 (quoting Liberty Lobby, 477 U.S. at 255 (discussing propriety of summary judgment)) (emphases ours); see, e.g., Agosto v. INS, 436 U.S. 748, 756 (1978) ("a district court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented"); Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 696 (1962) (in reviewing a directed verdict, court of appeals must "view the evidence in the light most favorable to [the party against which the verdict was directed] and give [that party] the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn"). "Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility,

summary judgment is not appropriate." Fed. R. Civ. P. 56(e) Advisory Committee Note (1963).

In reviewing the record as a whole, "the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" Reeves, 530 U.S. at 151 (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529 (2d ed. 1995), at 300). But a jury is free to believe part and disbelieve part of any witness's testimony, see, e.g., Fiacco v. City of Rensselaer, 783 F.2d 319, 325 (2d Cir. 1986), cert. denied, 480 U.S. 922 (1987); United States v. Gleason, 616 F.2d 2, 15 (2d Cir. 1979), cert. denied, 444 U.S. 1082 (1980), and the court considering a summary judgment motion "must disregard all evidence favorable to the moving party that the jury is not required to believe," Reeves, 530 U.S. at 151 (emphasis added).

Our review of the record persuades us that these principles were not properly applied in the present case. Although the parties debate their application with respect to each of Jasco's four causes of action against Dana, we need discuss no more than one, since if any one of Jasco's causes of action could not properly be summarily dismissed, Dana's Objection to the Jasco Claim should have been rejected. We will thus limit our discussion to the alleged conspiracy, or concerted action, to misappropriate Jasco's trade secrets, the cause of action that presents one of the clearest factual disputes.

Confidential proprietary data relating to pricing, costs, systems, and methods are protected by trade secret law. See generally Lehman v. Dow Jones & Co., 783 F.2d 285, 298 (2d Cir. 1986). Under New York law, which governs Jasco's cause of action for the misappropriation of its trade secrets, a plaintiff may, on a theory of concerted action, recover damages from a defendant that was one of a group of entities if at least one of those entities committed a tort in pursuance of a common plan or design, see, e.g., Rastelli v. Goodyear Tire & Rubber Co., 79 N.Y.2d 289, 295, 582 N.Y.S.2d 373, 375 (1992), and the defendant knew the wrongful nature of the primary actor's conduct and intended to assist in or profit from the commission of the tort, see, e.g., id.; National Westminster Bank USA v. Weksel, 124 A.D.2d 144, 147, 511 N.Y.S.2d 626, 628-29 (1st Dep't), appeal denied, 70 N.Y.2d 604, 519 N.Y.S.2d 1027 (1987). Such liability may also be imposed on one who encourages the commission of a tort or who, knowing of a tort committed for its benefit, ratifies it:

> Concerted action liability rests upon the principle that "[a]ll those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt his acts done for their benefit, are equally liable with him" (Prosser, Torts [4th ed], § 46, at p 292; see, also, Restatement, Torts 2d, § 876). An injured plaintiff may pursue any one joint tort-feasor on a concerted action theory . . . .

Bichler v. Eli Lilly & Co., 55 N.Y.2d at 580-81, 450 N.Y.S.2d at 780 (emphases added).

Dana argues that Jasco has "manufactured an elaborate conspiracy theory" (Dana brief on appeal at 1 (emphasis added)), endorsing the bankruptcy court's conclusion that "there is no evidence connecting Dana to the alleged conspiracy," Bankruptcy Court Decision, 2007 WL 3376882, at *7. We have two difficulties with this conclusion. First, Dana itself stated to the bankruptcy court that "[t]he reason" for the lack of direct evidence of Dana's knowledge of the misappropriation was "simple: each of the principal witnesses denied knowledge of anyone ever telling Dana of the alleged conversion." (Dana Reply ¶ 9 (citing testimony by Convertino, Zicari, and Haybach) (emphasis ours).) But Convertino, Zicari, and Haybach, accused of participating in, or knowingly encouraging or ratifying, the misappropriation of Jasco's trade secrets, were hardly disinterested witnesses. Of course, the fact that their denials were self-serving does not mean that such testimony would not be admissible at trial; the self-serving nature of a witness's statements goes to the statements' weight, not to their admissibility. See, e.g., St. Pierre v. Dyer, 208 F.3d 394, 405 (2d Cir. 2000); United States v. Lawal, 736 F.2d 5, 8 (2d Cir. 1984). But the weighing of such statements is a matter for the finder of fact at trial, "not the prerogative of the court on a motion for summary judgment." St. Pierre v. Dyer, 208 F.3d at 405.

Second, the denials by Convertino, Zicari, and Haybach of knowledge on the part of Dana could not justify the entry of summary judgment because it is well established that "'[b]oth the

existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and . . . intent may be established through circumstantial evidence,'" United States v. Huezo, 546 F.3d 174, 180 (2d Cir. 2008) (quoting United States v. Stewart, 485 F.3d 666, 671 (2d Cir. 2007)). Circumstantial evidence may permit a factfinder to infer that a witness had knowledge of a particular fact despite his testimonial denial of knowledge. See, e.g., Smith v. California, 361 U.S. 147, 154 (1959).

The bankruptcy court, in support of its conclusion that there was "no evidence connecting Dana to the alleged conspiracy," stated that "[t]he fact that Dana knew that Messrs. Zicari and Convertino became Nationwide employees is not probative of a conspiracy or proof of trade secret misappropriation," Bankruptcy Court Decision, 2007 WL 3376882, at *7. But in focusing on the sole facts that Nationwide hired Zicari and Convertino and that Dana knew of those hirings, the court surely viewed the record in piecemeal fashion and ignored other evidence favorable to Jasco, for there was both (1) direct evidence that trade secrets were in fact misappropriated and that a conspiracy to misappropriate them existed, and (2) circumstantial evidence from which it could be inferred that Dana knew of the trade secret misappropriation conspiracy and encouraged or ratified the misappropriation.

1. Direct Evidence of the Existence of Conspiracy

As to the existence of a conspiracy, two opinions of the state courts cited evidence from Convertino himself, a member of the conspiracy. In Jasco II, submitted by Dana with its Reply to Jasco's Response to Dana's Objection, the state court quoted a Convertino affidavit describing the commencement of his tortious collaboration with Zicari and Rogers:

> ¶ 14. In approximately April of 1999, while all three of us were still employees of Jasco, Chuck Zicari approached me, told me that he was thinking of starting his own business in Kentucky, in competition with Jasco, and asked me whether I was interested in joining him. . . . He also told me that Gary Rogers was helping him.

> ¶ 15. . . . Chuck told me . . . that while Gary was still at Jasco, he went into Chuck's personnel file and removed from it Chuck's signed Non-Compete Agreement and that he believed it was destroyed, thus enabling Chuck to carry forward with this plan.

Jasco II at 2-3 (second emphasis in Jasco II; other emphases ours). And the Appellate Division in Jasco I stated that "[a]ccording to Convertino, Rogers aided the efforts of Convertino and Zicari by providing them with documents while he was still employed by plaintiff." 303 A.D.2d at 945, 757 N.Y.S.2d at 653 (quoted in Jasco II at 1).

Further, as described in Part I.A. above, Zicari knew that Convertino had computer records containing Jasco data as to, inter alia, the materials, manufacturing processes, pricing, and costs for all of the parts Jasco was selling to Dana. In the last week of Convertino's employment with Jasco, Zicari, who had just left Jasco, told Convertino that "it would be helpful for competitive reasons to have that information available after

[Convertino's] departure." (Convertino Dep. at 87-88.) Accordingly, Convertino, who had "some animosity" toward Jasco (id. at 44), took with him all the Jasco data that he thought would be useful to himself and Zicari (see id. at 1738-40; see also id. at 44-45) "to go after the Dana business" "[w]ith some other company" (id. at 1739). Convertino testified that the information he took had been developed in part by "other employees at Jasco" "over a number of years" (id. at 89); that it was nonpublic information (see id.) that was "proprietary to Jasco" (id. at 290); and that he knew "it was unethical" to take it (id. at 1740).

Moreover, Convertino indicated--with some apparent reluctance--that Nationwide must have known he used confidential and proprietary information belonging to Jasco in order to prepare Nationwide's bid to Dana:

> Q. Now, <u>did Messrs. Ricotta and Nuccitelli understand that you were giving them proprietary information belonging to Jasco</u>?
>
> . . . .
>
> A. They were very concerned whether or not I had signed a no-compete clause or confidentiality agreement.
>
> Q. <u>Again, the question is, were they aware that you were providing to them proprietary information that you had taken from Jasco</u>?
>
> . . . .
>
> A. They knew that I was using my experience as a basis of coming up with estimates for them.
>
> Q. <u>Did they know that you had actual documents that you had taken from Jasco</u>?

> A. _I would have to say yes_, because I provided them with the cost breakdown and quantities that I faxed to Chuck Zicari. I couldn't have had those without taking documents from Jasco.

(Convertino Dep. at 290-91 (emphases added).)

Thus, the record contains evidence from a confessed coconspirator that would permit a jury to find that Jasco trade secrets were misappropriated, that there existed a trade secret misappropriation conspiracy of which at least Rogers, Zicari, and Convertino were members, and that the conspiracy was joined by Nationwide.

2. **Circumstantial Evidence that Dana Had a Culpable Role**

The record also contains circumstantial evidence from which a jury could permissibly infer that Dana had knowledge of the theft, and/or the planned theft, of Jasco trade secrets as early as the summer of 1999 and that, either at that time or thereafter, Dana agreed to--and eventually did--knowingly take advantage of that misappropriation in order to lower its purchasing costs by many millions of dollars (see Haybach Dep. at 447-49 (the combined effect of Dana's rejection of the Jasco proposed price increases (more than $8 million) and its acceptance of the Nationwide price reductions ($7.4 million) was to save Dana nearly $15.5 million)).

As to the events in the summer of 1999, preceding Nationwide's offers, the evidence described in Parts I.A., I.C., and II.C.1. above, taken in the light most favorable to Jasco, includes the following. Rogers was forced to retire as Jasco's

- 47 -

president on May 31; before leaving, he began helping Zicari to prepare to compete with Jasco, by removing Zicari's non-compete or confidentiality agreement from Jasco's locked personnel files and destroying it, and by providing Zicari and Convertino with other documents. Rogers had been "Dana's primary contact person at Jasco" (Haybach Aff. ¶ 4); but after his retirement, Buss had no legitimate business reason to speak with him. Yet, in June, within the first week after Rogers involuntarily retired, he repeatedly called Buss; one of their telephone conversations lasted 30 minutes. Buss categorically denied ever speaking to Rogers after Rogers's retirement; and when confronted with telephone company records showing such calls, Buss testified that he had no recollection of those calls. Additional telephone company records show an August 12 sequence in which Rogers again called Buss and they conversed for 25 minutes; Rogers immediately thereafter called Zicari, with whom he conversed for 13½ minutes; and Zicari then immediately called Nationwide. Zicari went to work for Nationwide on August 16. In late August, Zicari called Buss twice and thereafter called Nuccitelli to tell him that Nationwide had "an opportunity with Dana" (Nuccitelli Dep. at 110). As with respect to the telephone calls from Rogers in June, Buss professed to have no recollection of his 25-minute telephone conversation with Rogers in August.

The bankruptcy court found that the telephone records provided no support for Jasco's claims, but that assessment plainly did not view this evidence in the light most favorable to

Jasco. A jury could easily believe, in light of the telephone records, that Buss's denial of any contact with Rogers after Rogers's retirement was untruthful. And, as "the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt," Reeves 530 U.S. at 147 (internal quotation marks omitted), the jury could also infer (a) that Buss's denial and his assertion that he does not remember the calls from Rogers are designed to conceal the subject matter of those conversations, and (b) that the conversations concerned precisely what actually occurred: that Zicari's and Convertino's planned or eventuated theft of Jasco trade secrets would benefit Dana by allowing it to receive a 10% discount from the prices charged by Jasco if Dana would replace Jasco with another company employing Zicari and Convertino.

We note that both Buss and Haybach admitted that they had received calls from Zicari; they stated that the subject was Zicari's plan to start his own company and his hope to solicit business from Dana. Buss testified that he did not recall precisely when he received such a call; Haybach stated that he received such calls "[a]fter Mr. Zicari left Jasco, and before he began with Nationwide"; and Haybach denied that these conversations related to "the renewal of the Jasco contract." (Haybach Aff. ¶ 20; see Buss Dep. at 92.) Any such denials by Haybach or Buss as to the contents of their many July and August conversations with Zicari (see, e.g., Part I.A. above) are, of course, subject to credibility assessments by a factfinder, which

- 49 -

would not be required to believe the denials. But in any event, we have seen nothing in the record before us that even attempts to provide an innocent explanation for Zicari's calls to Buss on August 20, i.e., after he had abandoned his plan to start his own business and had gone to work for Nationwide, and shortly before he called Nuccitelli to say that Nationwide had an opportunity with Dana.

As to Nationwide's proposals in the fall of 1999, the bankruptcy court ruled that Nationwide's PowerPoint presentation to Dana--which stated, inter alia, that Nationwide had employees who were "'intimately knowledgeable with [the Dana] program,'" Bankruptcy Court Decision, 2007 WL 3376882, at *7 (quoting Baldino Decl. Exhibit E)--did not convey to Dana any sense that Nationwide had access to Jasco trade secrets but instead "simply acknowledge[d] the fact that experienced former Jasco employees would be involved with a Nationwide-Dana relationship," Bankruptcy Court Decision, 2007 WL 3376882, at *7. We have difficulties with this ruling as well. First, it is a finding of fact. On a motion for summary judgment, the court is to identify factual issues, not to resolve them. Second, this finding did not evaluate the statements by Nationwide either in light of the record as a whole or in the light most favorable to Jasco. As a whole and in that light, the record contains evidence that Nationwide had almost no prior experience in machining the types of parts Dana was buying from Jasco; that Convertino took confidential and proprietary data belonging to Jasco with him to Nationwide in order to facilitate

competition against Jasco; that Convertino knew it was unethical for him to take that information; that barely six months after Convertino's arrival at Nationwide, as soon as the Dana contract was secured, Nationwide gave and promised Convertino substantial salary raises, plus bonuses totaling $44,000, i.e., in excess of 60% of his Nationwide starting salary, as a reward for "his involvement in securing the Dana Contract" (Baldino Decl. Exhibit K); and that Convertino testified he "would have to say" that Nationwide knew he had proprietary Jasco documents that he was using to help prepare the Nationwide proposal to Dana (Convertino Dep. at 291). Persons engaged in wrongful activity frequently use coded language to convey meanings that are not intended to be understood by outsiders. In light of the record as a whole, the import of the assurances to Dana that Nationwide had employees who were "intimately knowledgeable" about the parts in question, with "past experience with [the] program" (Baldino Decl. Exhibit E), is a matter for assessment by the finder of fact. The factfinder of course will not be required to view the evidence in the light most favorable to Jasco; but since the factfinder is permitted to do so, the bankruptcy court was not allowed to grant summary judgment based on its own view that the Nationwide PowerPoint statements were simply innocuous.

Dana, in arguing to the bankruptcy court that there was no evidence that Dana knew the Nationwide bid contained, or was prepared using, Jasco trade secrets, repeatedly cited testimony by Haybach (see Dana Objection ¶¶ 32, 44; Reply ¶ 9), that Haybach

did not "have any inkling that Nationwide personnel had stolen confidential or proprietary information from Jasco" (Haybach Dep. at 526-27). Yet Haybach also asserted that at no time prior to awarding Nationwide the contract to succeed Jasco did Dana inform Nationwide of the prices that Jasco was charging. (See Haybach Dep. at 457, 493-94 ("I d[id] not, and I am reasonably assured that none of our people would do that" because it would have been "bad-bad," "not right," "not ethical," "not fair").) If the jury credits this assertion that Nationwide did not learn Jasco's prices from Dana, the jury may well infer that, far from having no inkling that Zicari and Convertino had stolen Jasco trade secrets, Haybach, Blanchard, and Buss must have known to a certainty that Nationwide was using such stolen trade secrets, given that Nationwide quoted to Dana a price that was exactly 10% less than Jasco's price for each and every one of the 130 parts. Such an inference as to Dana's knowledge could lead to a finding that, in entering into the agreement with Nationwide, Dana ratified and adopted the theft of Jasco's confidential and proprietary information.

Further, in assessing the credibility of the Haybach testimony relied on by Dana for the proposition that Dana had no knowledge that Nationwide was using or had used confidential information belonging to Jasco (Dana did not cite to denials by any other Dana employee as to such knowledge), the jury would also be entitled to take into account Buss's implausible denial of any recollection of his lengthy conversations with Rogers and the

- 52 -

fact that Haybach and Blanchard made false statements in their state-court affidavits (quoted in Part I.A. above) as to the origin of Dana's contact with Nationwide. The representations by Haybach and Blanchard that Dana did not have contact with Nationwide until after December 3 were squarely contradicted by, inter alia, (a) Haybach's September 30 e-mail stating that Zicari had already "verbally committed to a 10% price reduction from Jasco's 1/1/2000 pricing" and instructing Buss to send Nationwide bidding materials (Baldino Decl. Exhibit C); (b) Haybach's personal calendar entries showing four meetings with Nationwide in October and November (see id. Exhibit D); and (c) the November 26 written confirmation from Nationwide addressed to Blanchard (see id. Exhibit F).

Finally, we note that the bankruptcy court found that "Nationwide's employment of individuals who had worked with Dana and knew Dana's business [wa]s conduct consistent with permissible business competition," citing the statement in Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), that "conduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy," id. at 597 n.21. Bankruptcy Court Decision, 2007 WL 3376882, at *7. We have considerable difficulty with the bankruptcy court's finding and its reliance on Matsushita. First, Matsushita, unlike Jasco's state-court action, involved antitrust claims, and the Matsushita Court noted that

"antitrust law limits the range of permissible inferences from ambiguous evidence in a [Sherman Act] § 1 case," 475 U.S. at 588.

Second, the context of the Matsushita Court's reference to conduct that is "as consistent with permissible competition as with illegal conspiracy" was the allegation that Japanese manufacturers who were in competition with each other, had entered into a predatory pricing scheme in which they would sell their products below cost in the United States in order to drive competing American manufacturers out of business. Given that such a scheme would entail sure and immediate losses--with only a speculative hope of future profits that might not be achievable without resort to price-fixing or some other surely actionable anticompetitive conduct--the Supreme Court found that the scheme alleged was inherently implausible. The Court stated that "if the factual context renders [the plaintiffs'] claim implausible--if the claim is one that simply makes no economic sense--[the plaintiffs] must come forward with more persuasive evidence to support their claim than would otherwise be necessary." Matsushita, 475 U.S. at 587 (emphasis added); see id. at 597-98 (remanding for consideration of whether there was sufficiently unambiguous evidence to permit a jury to find that the defendants conspired as alleged "despite the absence of any apparent motive," in order to engage in conduct that was "economically senseless").

The Matsushita discussion has little resonance here. Jasco's claim of trade secret misappropriation does not allege economically senseless parallel actions by persons competing with

each other. Rather it charges collaborative action by, _inter alia_, (a) a buyer that saved more than $15 million on its purchases (_see_ Haybach Dep. at 447-49), (b) a seller that "generate[d] a $2M bottom line" from "$25M in sales with no acquisition costs" (Baldino Decl. Exhibit J (Nationwide internal memorandum of Ricotta and Nuccitelli dated October 6, 1999, at 2)), and (c) a disgruntled former Jasco employee who, by reason of his theft of Jasco trade secrets, received many thousands of dollars in salary increases and bonuses (_see_ Convertino Dep. at 44; Baldino Decl. Exhibit K).

Finally, _Matsushita_ stated that an inference of conspiracy is not supported by mere proof of conduct that is as consistent with permissible competition as with illegal conspiracy, "without more." 475 U.S. at 597 n.21. The record described above, including the direct evidence as to the existence of a trade secret misappropriation conspiracy and the use of Jasco trade secrets demonstrably profiting at least Convertino, Nationwide, and Dana, and the circumstantial evidence from which Dana's knowledge, encouragement, ratification, and adoption of the theft and use of Jasco trade secrets could be inferred, surely provided the _Matsushita_ "more."

CONCLUSION

We have considered all of Dana's arguments on this appeal and have found in them no basis for affirming the grant of summary

- 55 -

judgment dismissing and expunging Jasco's Claim. The judgment of the district court and the November 16, 2007 Order of the bankruptcy court are vacated, and the matter is remanded for further proceedings not inconsistent with this opinion.