09-1859-cv
Kaytor v. Electric

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2009

(Argued: January 13, 2010                    Decided: June 29, 2010)

Docket No. 09-1859-cv

_____

SHARON KAYTOR,

Plaintiff-Appellant,

- v. -

ELECTRIC BOAT CORPORATION,

Defendant-Appellee.

_____

Before: KEARSE, CABRANES, and HALL, Circuit Judges.

Appeal from a judgment of the United States District Court for the District of Connecticut, Dominic J. Squatrito, Judge, summarily dismissing claims of hostile work environment, retaliation, and intentional infliction of emotional distress for lack of evidence as to, inter alia, harassment on the basis of gender, sufficiently severe or pervasive harassment, or outrageous conduct. See Kaytor v. Electric Boat Corp., No. 3:06CV01953, 2009 WL 840669 (D. Conn. Mar. 31, 2009).

Affirmed in part, vacated and remanded in part.

CYNTHIA R. JENNINGS, Windsor, Connecticut, for Plaintiff-Appellant.

MICHAEL CLARKSON, Boston, Massachusetts (Robert P. Joy, Morgan, Brown & Joy, Boston, Massachusetts, on the brief), for Defendant-Appellee.

GAIL S. COLEMAN, Washington, D.C. (James L. Lee, Deputy General Counsel, Lorraine C. Davis, Acting Associate General Counsel, Carolyn L. Wheeler, Assistant General Counsel, United States Equal Employment Opportunity Commission, Washington, D.C., on the brief), for Amicus Curiae United States Equal Employment Opportunity Commission in support of Appellant.

KEARSE, Circuit Judge:

Plaintiff Sharon Kaytor appeals from a judgment of the United States District Court for the District of Connecticut, Dominic J. Squatrito, Judge, dismissing her complaint alleging principally that defendant Electric Boat Corp. ("Electric Boat" or the "Company"), her former employer, discriminated against her on the basis of gender by maintaining a hostile work environment and retaliated against her for complaining about sexual harassment by her supervisor, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and state law. The district court granted summary judgment dismissing the complaint, concluding, inter alia, that Kaytor failed to adduce evidence that would permit inferences that the incidents of which she complained were sufficiently pervasive or severe to create a hostile work environment, were gender-related, or were retaliation for her protests against sexual harassment. On appeal, Kaytor contends that summary judgment was inappropriate because there were genuine issues of material fact to be tried as

- 2 -

to each of her claims. For the reasons that follow, we agree that summary judgment was inappropriate with respect to Kaytor's claims of hostile work environment and with respect to one aspect of her claims of retaliation, and we remand for further proceedings with respect to those claims. As to Kaytor's other claims, we affirm the judgment of dismissal.

## I. BACKGROUND

Electric Boat designs and builds nuclear submarines for the United States Navy in Groton, Connecticut. Kaytor worked at Electric Boat from 1973 until her employment was terminated by the Company in January 2007. Her claims of gender discrimination center on her treatment by Daniel J. McCarthy, one of the managers in the engineering department, from 2004 through April 2005. The following description, taken largely from Kaytor's deposition testimony in the present action ("Kaytor Dep.") and from, to an extent, Electric Boat's Investigative Report dated July 21, 2005 ("EB Report" or "Report"), with respect to Kaytor's complaints about McCarthy, sets out the evidence in the light most favorable to Kaytor as the party against whom summary judgment was granted.

### A. The Events Involving McCarthy

From 1998 until late January 2007 Kaytor was an administrative assistant in Electric Boat's engineering department, and from 1998 until mid-May 2005 she was secretary to

McCarthy. His branch of the department included several dozen engineers, whose work was overseen by six supervisors who reported to him. Kaytor testified that her job with McCarthy included ordering supplies for the entire engineering department, which included 400-500 engineers. (See Kaytor Dep. 17.) This entailed some degree of discretion. McCarthy would give her a budget and have her determine, based on her knowledge and experience, what should be ordered; Kaytor would send McCarthy information as to whatever she was ordering, and he would routinely approve. (See id. at 16-17.) Kaytor testified that during the first several years in which she worked directly for McCarthy, their relationship was suitably businesslike. (See id. at 176.)

In 2004 and 2005, however, McCarthy was "having problems," going through a divorce (id. at 183; see id. at 181, 242; EB Report at 13), and seemed to undergo a change of character (see Kaytor Dep. 181-83, 241). Although he never touched Kaytor in a violent or sexual way, never asked her for sex, and never asked her out on a date (see id. at 192), in 2004 McCarthy began making inappropriate comments to her and engaging in sexually suggestive behavior. Although he frequently made fun of women, especially of their weight, and made comments about their bodies (see id. at 226), McCarthy paid Kaytor compliments on her clothing (see id. at 245) and told her she looked good for a woman her age (see EB Report at 10). Some of his comments were not in and of themselves offensive, but on many occasions Kaytor perceived McCarthy to be staring at her body and leering at her (see Kaytor Dep. 245-46);

- 4 -

she testified that her reaction was to "ignore the look" (id. at 246). On one occasion, McCarthy entered Kaytor's office and complimented her on two scarves that were lying on her desk. He then picked them up, "brought them to his nose and he sa[id], 'Umm, they smell like you.'" (Id. at 204.) McCarthy then approached Kaytor more closely, apparently smelling her hair; Kaytor became nervous, turned her back, and started typing until McCarthy departed. (See id.)

Kaytor testified that she believes McCarthy "had designs" on her and that "when things did not go his way, the relationship became sour and he would make many off-colored comments to me," such as stating "you have a flat ass." (Kaytor Dep. 176; see also id. at 255 ("I believe Mr. McCarthy was very bitter because I would not associate with him outside the workplace or fall for his advances.").) McCarthy's initial "flat ass" comment, which he promptly repeated, came "out of the blue" while Kaytor was talking to one of the supervisors: "All of a sudden out of the blue Mr. McCarthy yells out at the top of his lungs and everybody could hear, you have a flat ass." (Id. at 179-80.)

McCarthy also threatened Kaytor with physical harm (see Kaytor Dep. 186-87) and often wished her dead, saying "I'd like to see you in your coffin" (id. at 177). On at least six occasions, McCarthy said he wanted to "choke" Kaytor. (E.g., id. at 186-87.) Coworkers who overheard these comments would come up to Kaytor and say, "'Do you realize what he's saying, Sharon? You should start thinking about taking it more seriously.'" (Id. at 187.)

Kaytor testified that, instead, she "would brush it off time and time again." (Id. at 186.) Kaytor did not complain to the Company's human resources department ("HR") about the choking comments but did complain to her union counselor, who told her to "'cut [McCarthy] some slack'" because he was "going through a divorce"; so she kept "brushing it off thinking he doesn't mean it. . . . But the more he kept saying it, [she] became a little bit nervous." (Id. at 191.) Kaytor testified that on one occasion, McCarthy "called me into his office . . . and he said out of the blue, 'I wish you were retired.' And I said, 'Why?' And he said, 'So I could come to your home and choke you.'" (Id. at 188.)

Kaytor also described an incident in which she had informed McCarthy that she needed to leave the office at a certain time for a doctor's appointment, and she and some of her female coworkers had discussed that she was to have her annual checkup with her gynecologist. McCarthy apparently overheard that discussion; and as Kaytor was leaving, walking down the hallway, McCarthy yelled, in the presence of several coworkers, "'You are going where every man wants to be.'" (Kaytor Dep. 177, 206-07.) On another occasion, McCarthy "stated that [Kaytor] was spreading [her] legs for the doctor." (Id. at 177.)

Kaytor complained about some of these events to her union representative; but until April 2005, she had not complained to Electric Boat's higher management. In early 2005, Kaytor had told McCarthy that if he did not cease his comments she was going to

- 6 -

report his remarks to a Company vice president; in response, McCarthy got a "horrid look on his face and he said 'I'll kill you.'" (Kaytor Dep. 241-42.) "[S]cared to death" by this response, Kaytor "went back to [her] office" and said to herself, "'Oh boy, I better never do that.'" (Id. at 242.)

The incident that finally led Kaytor to complain to Electric Boat's higher management occurred in late April 2005, on "Administrative Assistant's Day." It was a custom in the Company's engineering department for supervisors to recognize that day by giving their administrative assistants or secretaries gifts. In the years prior to 2005, McCarthy had given Kaytor nice flowers or gifts of $100 or $200. (See Kaytor Dep. 210, 221.) On April 27, 2005, McCarthy gave Kaytor an unattractive potted bush and a card that Kaytor believed were intended to be "derogatory and sexual." (Id. at 225.) The handwritten message on the card read, "I wish you the best and thank you for your help this past year. The plant is/can be planted outside and I hope bring[s] you pleasure in the years ahead." (Kaytor Dep. Exhibit 37 (emphases in original).) Kaytor found the card offensive because of the nature of the plant (see Kaytor Dep. 221): The plant was a variety of Salix commonly known as a pussy willow.

B. The Company's Response to Kaytor's Protest

"[A]fter the pussy willow incident," Kaytor "couldn't take any more." (Kaytor Dep. 185.) She complained to the Company's ombudsperson; and, within a week or two of the incident (a delay

"because [she] was scared" (id. at 186)), she complained about McCarthy to HR. The pussy willow bush was apparently the talk of the office. Kaytor testified that an HR employee, Cheryl Stergio, told her that "people were talking about it throughout the plant" (id. at 280), and that Stergio said "coming in to work," and just walking down the hall, "she could hear people talking about what McCarthy did to [Kaytor], the pussy willow bush and the flat ass comment" (id. at 280-81). Bryan Burdick, a staff engineer who had been away when Kaytor received the plant, heard "talk on the floor" about it "from about a half dozen people" when he returned. (EB Report at 7.)

HR conducted an investigation of Kaytor's complaints, interviewing Kaytor, McCarthy, Burdick, several of Kaytor's coworkers, and Al Crogle, a supervisor who reported to McCarthy. The EB Report described, inter alia, statements from coworker Linda Christie who had heard McCarthy make the "flat ass" comment. (EB Report at 4.) Christie said that McCarthy used crass language with everyone, regardless of gender. She said that on one occasion she had gone to McCarthy's office to ask "where Sharon Kaytor was," and "McCarthy replied 'she's spreading her legs for the doctor.'" (Id. at 5.) When asked about the pussy willow bush incident, Christie said "she believed that McCarthy intended to annoy Kaytor with the plant by its underlying sexual connotation. She added, 'However, if anyone else got the same plant as a gift I don't think that it would have had the same effect of underlying sexual connotation.'" (Id. (emphasis in Report).) Another

8

coworker, Sheryl Williams, said she had seen the bush and found it to be "a poor specimen"; in ordinary circumstances, she would have considered it simply "'a poor choice of a gift.'" (Id. at 7 (emphasis in Report).) However, Williams, said that Kaytor had "'relayed to [her] incidents where Dan had harassed [Kaytor]. If those stories are true, [Williams] could see the plant having a sexual connotation based on the name . . . .'" (Id. (emphasis in Report).)

McCarthy, in his HR interview, ascribed Kaytor's accusations to her displeasure with him because she believed he had not supported her in a workers compensation claim. (See EB Report at 9.) He admitted making a "flat ass" comment in a conversation with Kaytor in his office, but he stated that he had simply been repeating a doctor's remark that Kaytor herself had relayed to McCarthy several times (EB Report at 9-10)--remarks and conversations that Kaytor "[a]bsolutely" denied had ever occurred (Kaytor Dep. 182). McCarthy also stated that Kaytor had initiated conversations with him about her breast size and sex life (see EB Report at 11)--an assertion that Kaytor testified was entirely "untrue" (Kaytor Dep. 283-84).

When "asked specific questions regarding the allegations made by Kaytor" (EB Report at 9), McCarthy's responses were, inter alia, that he "'d[id] not recall'" telling Kaytor he wanted to choke her; that he "'ha[d] no recollection'" of saying he wanted to see Kaytor in her coffin or that he wanted to come to her home and choke her; that he had "no recollection" of picking up a scarf

from Kaytor's desk and smelling it; and that he had "no recollection" of making a comment as to Kaytor's "spreading her legs for the doctor." (Id. at 10 (emphases in Report).)

On May 16, 2005, the day after the HR investigation was begun, Kaytor was transferred away from McCarthy; within an hour of her first interview with HR, the Company packed up her belongings and moved her to an office down the hall (see Kaytor Dep. 289). She was reassigned to work for Crogle, a supervisor with whom she had previously had a friendly relationship (see, e.g., id. at 296, 300); Crogle was supervised by McCarthy. On the day after that reassignment, HR offered Kaytor the opportunity to be retransferred to her old job with McCarthy. (See id. at 290, 294). She considered it but eventually declined. (See id. at 294). She was not offered an opportunity to work in a different Company building or to work for anyone who was not supervised by the manager who had harassed her. (See id. at 288-89.)

Kaytor testified that although her compensation remained the same after her transfer to Crogle, she was treated poorly. She was placed in an office in which paint chips containing lead were underfoot and regularly fell on her desk; and on a day when Electric Boat announced a rule that anyone using certain internet websites could be fired, the Company gave her a computer that was loaded with prohibited programs that she could access accidentally and be fired. (See id. at 299, 313-14.) Kaytor testified that although Crogle treated her normally at first, after a couple of months "retaliation started." (Id. at 297.) Her work hours were

changed (see id. at 299-300); and whereas under McCarthy she had been responsible for ordering supplies for the entire engineering department (see id. at 14, 16-17), when she was transferred to work for Crogle that job was taken away from her (see id. at 14, 298-99). Under Crogle, she testified, "I sat there with no work to do." (Id. at 299.) Yet, "continually on a daily basis," she was "harassed by Al Crogle" who would "scream and yell" at her for the "whole department" to hear. (Id. at 299, 301.) Kaytor testified that "[t]here was some harassment from some coworkers" (id. at 300), and she "was ostracized" (id. at 299).

## C. The Present Litigation

After filing administrative charges with the Connecticut Commission on Human Rights and the United States Equal Employment Opportunity Commission ("EEOC"), Kaytor commenced the present action in December 2006, alleging gender discrimination in violation of Title VII and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 et seq. The original complaint alleged that Kaytor had been subjected to a hostile work environment based on McCarthy's ongoing and continuous sexual harassment by means of his insulting and degrading remarks and actions and his threats to kill Kaytor; that after complaining to the Company about McCarthy, Kaytor was subjected to a pattern of continuous retaliation for having complained; and that these events had caused Kaytor severe emotional distress and physical illness.

- 11 -

In February 2007, Kaytor filed an amended complaint repeating the above allegations and adding that in January 2007, i.e., shortly after the December 2006 commencement of the present action, Electric Boat terminated Kaytor's employment in retaliation for her filing the action. It alleged that Electric Boat began its retaliation on January 17 by ordering Kaytor to undergo a psychiatric examination; and although Kaytor had agreed--under protest--to schedule such an examination, Electric Boat terminated her employment eight days later on the ground that she had not done so. Kaytor also claimed that Electric Boat's ultimatum that she undergo the psychiatric examination constituted an intentional infliction of emotional distress in violation of state law.

Following a period of discovery, Electric Boat moved for summary judgment dismissing the complaint, arguing principally that the incidents of which Kaytor complained did not create conditions so severe or pervasive as to permit an inference of a hostile work environment. It also argued that its instruction that Kaytor submit to a psychiatric examination was not based on any goal of retaliation but rather was based on indications, supported by medical evidence, that she may have been suffering from paranoia (see Part II.C.1. below).

In a Memorandum of Decision and Order dated March 31, 2009, see Kaytor v. Electric Boat Corp., No. 3:06CV01953, 2009 WL 840669 (D. Conn. Mar. 31, 2009) ("Kaytor I"), the district court granted summary judgment to Electric Boat, dismissing the

complaint in its entirety. The court found that Kaytor had not adduced evidence sufficient to establish a prima facie case of hostile work environment because she had alleged only "a few incidents that spanned a number of years. She herself discounts some of these incidents as not being offensive or sexual in nature." Kaytor I, 2009 WL 840669, at *8. The court found that the alleged incidents that were explicitly sexual "were episodic over a number of years, and are not sufficiently severe to overcome their lack of pervasiveness." Id. The court found that

> McCarthy's gift of a pussy willow was not necessarily sexual in nature at all, and the Court sees no evidence that it was meant to be so. The letter given with the pussy willow contains no sexual references, and the fact that the plant's name is similar to a slang term for female genitalia is not sufficient to demonstrate that the gift was, in fact, sexual in nature.

Id.

The court found that McCarthy's threats to choke or kill Kaytor did not contribute to her hostile work environment claim. Although it had noted that Kaytor maintained that "McCarthy 'at least six times' from 2004 to 2005 told her that he wanted to choke her, and on six more occasions, that he wanted to see her in a coffin," Kaytor I, 2009 WL 840669, at *3, the court stated that

> [t]here is a question as to how many times McCarthy did this; the Plaintiff could only recall one instance where he threatened to "kill" her and one instance where he threatened to "choke" her. In the Court's view, the Plaintiff has not offered any facts from which a reasonable jury could infer that these threats were made because of the Plaintiff's sex.

Id. at *9. It concluded that, absent those threats of violence, "the conduct in question was not pervasive enough to alter the

- 13 -

plaintiff[']s working environment, nor were the alleged incidents, when taken individually or viewed cumulatively, severe enough to alter the plaintiff[']s working environment." Id. at *9.

The court also dismissed the complaint insofar as it asserted a claim under Connecticut law for intentional infliction of emotional distress. It noted that, to establish such a claim, a plaintiff must show that a defendant's actions "were atrocious and utterly intolerable in a civilized community," id. at *12; and it concluded that Kaytor had not met that standard, see id.

As to Kaytor's claims of retaliation, the court found that because of the temporal proximity between her filing of the present lawsuit and the Company's termination of her employment, Kaytor had established a prima facie case with respect to the claim that her termination was retaliatory. See id. at *10. However, the court found that Electric Boat had proffered a nondiscriminatory explanation for her termination, i.e., Kaytor's refusal to submit to a psychiatric examination after exhibiting signs that she might not be fit for duty, see id. Noting the medical testimony proffered by Electric Boat, the court concluded that Kaytor had not come forward with any evidence that would permit a "reasonable jury in this case [to] find that the referral for [a psychiatric examination], and the Plaintiff's subsequent termination for refusing to go to [it], were pretext for unlawful retaliation." Id. at *11.

In dismissing the complaint, the district court did not discuss Kaytor's assertions that she had suffered retaliation in the conditions of her employment before she was terminated. The court stated that "the only protected activity argued" was the December 2006 filing of the lawsuit and that it "consider[ed] all arguments based on any other potential protected activities to be abandoned." Id. at *10 n.3. In a subsequent Memorandum of Decision and Order dated June 5, 2009, denying a motion by Kaytor for reconsideration, see Kaytor v. Electric Boat Corp., No. 3:06CV01953, 2009 WL 1580989 (D. Conn. June 5, 2009) ("Kaytor II"), the court stated that even if not abandoned, Kaytor's claim that she suffered retaliation prior to the termination of her employment was properly dismissed. It noted that the transfer of Kaytor from McCarthy to Crogle was plainly intended "to separate [Kaytor] from McCarthy while the investigation of [her] harassment claims w[as] pending," Kaytor II, 2009 WL 1580989, at *4, and that "[d]espite [Kaytor's] personal feeling that she was transferred to a less desirable position, or [her] personal feeling that she was 'isolated,' she has presented no evidence that a reasonable employee would hold the same beliefs," id. at *4 n.5.

## II. DISCUSSION

On this appeal, Kaytor contends that there are genuine issues of material fact to be tried as to each of her claims.

Electric Boat argues that the district court correctly determined as a matter of law that McCarthy's alleged statements and conduct did not create an actionable hostile work environment and that there was no triable issue of fact as to the claimed retaliation.

The EEOC has filed a brief as amicus curiae, taking no position as to most of Kaytor's claims but urging that we reverse the dismissal of the Title VII hostile work environment claim. The EEOC argues principally that to establish such a claim, a plaintiff need show only that the conditions were either pervasive or severe, not both; and that, even if the sexual harassment of an employee is not pervasive, the threat to kill such a person may constitute the requisite severity.

For the reasons that follow, we conclude that summary judgment was inappropriate with respect to Kaytor's claims of hostile work environment and her claims of pre-termination retaliation following her protest of the pussy willow bush incident, and we remand for trial with respect to those claims. We affirm the dismissals of Kaytor's claims of retaliatory termination and intentional infliction of emotional distress.

A. Summary Judgment Principles

A motion for summary judgment may properly be granted--and the grant of summary judgment may properly be affirmed--only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law. See Fed. R.

Civ. P. 56(c)(2); see, e.g., Jasco Tools, Inc. v. Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009) ("Jasco Tools"). The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) ("Liberty Lobby").

In determining whether the moving party is entitled to judgment as a matter of law, see generally id. at 250-51 (same standard governs summary judgment and judgment as a matter of law during or after trial); Jasco Tools, 574 F.3d at 151-52 (same), or whether instead there is sufficient evidence in the opposing party's favor to create a genuine issue of material fact to be tried, the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must "review all of the evidence in the record," Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000). This is especially so in considering claims of hostile work environment, see Part II.B. below. And in reviewing all of the evidence to determine whether judgment as a matter of law is appropriate, "the court must draw all reasonable inferences in favor of the nonmoving party," Reeves, 530 U.S. at 150 (emphasis added), "'even though contrary inferences might reasonably be drawn,'" Jasco Tools, 574 F.3d at 152 (quoting Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 696 (1962)). Summary judgment is inappropriate when the

admissible materials in the record "'make it arguable'" that the claim has merit, see, e.g., Jasco Tools, 574 F.3d at 151 (quoting Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980)), for the court in considering such a motion "'must disregard all evidence favorable to the moving party that the jury is not required to believe,'" Jasco Tools, 574 F.3d at 152 (quoting, with emphasis, Reeves, 530 U.S. at 151).

In reviewing the evidence and the inferences that may reasonably be drawn, the court "may not make credibility determinations or weigh the evidence. . . . 'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" Reeves, 530 U.S. at 150 (quoting Liberty Lobby, 477 U.S. at 255 (emphases ours)); see, e.g., Agosto v. INS, 436 U.S. 748, 756 (1978) ("a district court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented"). "Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." Fed. R. Civ. P. 56(e) Advisory Committee Note (1963).

In sum, summary judgment is proper only when, with all permissible inferences and credibility questions resolved in favor of the party against whom judgment is sought, "there can be but one reasonable conclusion as to the verdict," Liberty Lobby, 477 U.S. at 250, i.e., "it is quite clear what the truth is." Poller

- 18 -

v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467 (1962) (internal quotation marks omitted).

We review the district court's grant of summary judgment de novo, applying the same standards that govern the district court's consideration of the motion. See, e.g., Aulicino v. New York City Department of Homeless Services, 580 F.3d 73, 79 (2d Cir. 2009); Dillon v. Morano, 497 F.3d 247, 251 (2d Cir. 2007); Cruz v. Coach Stores, Inc., 202 F.3d 560, 567 (2d Cir. 2000) ("Cruz").

## B. The Title VII Hostile Work Environment Claim

Title VII prohibits "discriminat[ion] against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of," inter alia, "such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

> [T]his language "is not limited to 'economic' or 'tangible' discrimination. The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment," which includes requiring people to work in a discriminatorily hostile or abusive environment.

Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986) ("Meritor")).

Title VII "does not set forth 'a general civility code for the American workplace.'" Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998)). But "[w]hen the

19

workplace is permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' . . . Title VII is violated," Harris, 510 U.S. at 21 (quoting Meritor, 477 U.S. at 65, 67 (emphasis ours))--so long as there is a basis for imputing the conduct that created the hostile environment to the employer, see, e.g., Perry v. Ethan Allen, Inc., 115 F.3d 143, 152 (2d Cir. 1997) ("Perry"); Karibian v. Columbia University, 14 F.3d 773, 779 (2d Cir.), cert. denied, 512 U.S. 1213 (1994); Kotcher v. Rosa & Sullivan Appliance Center, Inc., 957 F.2d 59, 63 (2d Cir. 1992). Absent certain defenses that are not at issue on this appeal, an employer is presumed to be responsible where the perpetrator of the harassment was the plaintiff's supervisor. See, e.g., Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); Perry, 115 F.3d at 152-53.

As to "whether an environment is 'hostile' or 'abusive,'" Harris stated that that matter "can be determined only by looking at all the circumstances." 510 U.S. at 23 (emphasis added).

> These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Id*. (emphases added). Because the analysis of severity and pervasiveness looks to the totality of the circumstances, "the crucial inquiry focuses on <u>the nature of the workplace environment as a whole</u>," and "a plaintiff who herself experiences discriminatory harassment <u>need not be the target of other instances of hostility in order for those incidents to support her claim</u>." <u>Cruz</u>, 202 F.3d at 570 (emphases added); <u>see</u>, <u>e.g.</u>, <u>Perry</u>, 115 F.3d at 150-51.

<u>Harris</u> also established that both an objective and a subjective standard must be met to prove the existence of a hostile work environment violative of Title VII:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

510 U.S. at 21-22.

Isolated incidents generally will not suffice to establish a hostile work environment unless they are extraordinarily severe. <u>See</u>, <u>e.g.</u>, <u>Howley v. Town of Stratford</u>, 217 F.3d 141, 153 (2d Cir. 2000) ("<u>Howley</u>"); <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 768 (2d Cir. 1998); <u>Torres v. Pisano</u>, 116 F.3d 625, 631 n.4 (2d Cir. 1997) ("Of course, even a single episode of harassment, if severe enough, can establish a hostile work environment"). However, even if overtly gender-based discriminatory conduct is merely episodic and not itself severe, the addition of "physically

- 21 -

threatening . . . behavior" may cause "offensive or boorish conduct" to cross the line into "actionable sexual harassment." Cruz, 202 F.3d at 571.

It is axiomatic that to prevail on a claim of hostile work environment based on gender discrimination, the plaintiff must establish that the abuse was based on her gender. See, e.g., Raniola v. Bratton, 243 F.3d 610, 621 (2d Cir. 2001) ("Raniola"); Howley, 217 F.3d at 156. The "'harassing conduct need not be motivated by sexual desire,'" however, so long as it was motivated by gender. Raniola, 243 F.3d at 617 (quoting Oncale, 523 U.S. at 80 (emphasis ours)); see, e.g., Howley, 217 F.3d at 156. Further,

> [f]acially neutral incidents may be included . . . among the "totality of the circumstances" that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on sex. But this requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory.

Alfano v. Costello, 294 F.3d 365, 378 (2d Cir. 2002). Circumstantial evidence that facially sex-neutral incidents were part of a pattern of discrimination on the basis of gender may consist of evidence that "the same individual" engaged in "multiple acts of harassment, some overtly sexual and some not." Id. at 375. In Raniola, for example, we concluded that, given proof of instances of overt gender hostility by the supervisor of the female plaintiff, a rational juror could permissibly infer that his entire alleged pattern of harassment against her was motivated by her gender, even though some of the harassment was not facially sex-based. See 243 F.3d at 621-23. Thus, the

- 22 -

relevant circumstances in Raniola included not only offensive sex-based remarks, but also, inter alia, one dire facially gender-neutral threat of physical harm by the supervisor who had made those remarks. See id. at 621. In Fitzgerald v. Henderson, 251 F.3d 345 (2d Cir. 2001), cert. denied, 536 U.S. 922 (2002), we held that a claim of gender-based hostile work environment (as well as an "embedded" claim of retaliation) may be premised on evidence that a supervisor heaped abuse on the plaintiff because she had rejected his sexual advances. See 251 F.3d at 361; see also Howley, 217 F.3d at 156 (factfinder would be permitted to conclude that even facially gender-neutral harassment of female firefighter by a coworker was motivated by sex given that that coworker had previously engaged in explicitly gender-related harassment). So long as there is some evidentiary basis for inferring that facially sex-neutral incidents were motivated by the plaintiff's gender, the ultimate question of whether such abuse was "because of" the plaintiff's gender, 42 U.S.C. § 2000e-2(a)(1), is a question of fact for the factfinder. See, e.g., Raniola, 243 F.3d at 623; Howley, 217 F.3d at 156; Cruz, 202 F.3d at 571.

In sum, the question of whether considerations of the plaintiff's sex "caused the conduct at issue often requires an assessment of individuals' motivations and state of mind," Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001), and "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts," Washington v. Davis, 426 U.S. 229, 242

(1976). Thus, especially in the context of a claim of sexual harassment, where state of mind and intent are at issue, "the court should not view the record in piecemeal fashion," Fitzgerald v. Henderson, 251 F.3d at 360, and "[s]ummary judgment should be used 'sparingly,'" Distasio v. Perkin Elmer Corp., 157 F.3d 55, 61 (2d Cir. 1998).

In the present case, in light of the above substantive and procedural principles, we have several difficulties with the district court's summary dismissal of Kaytor's hostile work environment claim. First, in assessing the evidence as to whether there was an abusive environment resulting from discrimination based on gender, the court indicated that it was disregarding some evidence that would doubtless be admissible at a trial. For example, the fact that some of the McCarthy conduct and comments described by Kaytor were not directed at Kaytor or were not "sexual in nature," Kaytor I, 2009 WL 840669, at *8--such as his making fun of other women and discussing their bodies--does not mean that that conduct and those comments were irrelevant. Even if they did not evince sexual desire, a factfinder would be entitled to take them into consideration in assessing the work environment and in determining whether the abuse to which McCarthy subjected Kaytor was motivated by her gender.

More importantly, the court should not have excluded from consideration Kaytor's testimony as to McCarthy's stated desires to choke her, to see her in a coffin, and to kill her. According to Kaytor's testimony, which must be credited on a motion for

summary judgment against her, the threats were uttered by one who had "had designs on" Kaytor and who was miffed that she would not "fall for his advances" (Kaytor Dep. 176, 255). A rational juror could permissibly infer that McCarthy's harsh treatment of Kaytor was the result of his spurned advances.

A rational juror could also infer from McCarthy's overtly sexual comments that the facially gender-neutral threats he directed at Kaytor were, in fact, "because of" her sex. See 42 U.S.C. § 2000e-2(a)(1). In Alfano v. Costello, there were four incidents that had overtly sexual overtones but were perpetrated by someone other than the defendant; we held that those incidents provided no basis for inferring that wholly different facially sex-neutral incidents involving the defendant were part of a campaign by the defendant to harass the plaintiff on the basis of her sex. See 294 F.3d at 370, 378. Here, unlike Alfano, a rational juror could permissibly infer from McCarthy's sexual comments that his physical threats were also motivated by Kaytor's sex.

Electric Boat suggests that McCarthy's threats to choke Kaytor were in fact gender-neutral because "McCarthy allegedly made such comments to at least one other male employee . . . ." (Electric Boat brief on appeal at 49.) This suggestion provides no support for a judgment in favor of Electric Boat for several reasons. For one thing, the only such "alleg[ation]" we have seen in the record is the EB Report's description of a statement by McCarthy himself. And although McCarthy told HR that he had

jokingly told Crogle he would like to choke Crogle (see EB Report at 10, 15), no such conversation about choking is reflected in the Report's description of the HR interview with Crogle, who said that when McCarthy was displeased with Crogle's work, McCarthy would jokingly threaten to "fire[] him" (id. at 6).

In contrast, the Report notes that Linda Christie stated in her HR interview that, although she had not taken it seriously, McCarthy had once told her he would like to choke her (see EB Report at 5). Thus, the record permits an inference that McCarthy's threats to choke were directed only at women, not at men. More importantly,

> the inquiry into whether ill treatment was actually sex-based discrimination cannot be short-circuited by the mere fact that both men and women are involved. . . . It would be exceedingly perverse if a male [supervisor] could buy . . . his company immunity from Title VII liability by taking care to harass sexually an occasional male worker, though his preferred targets were female.

Brown v. Henderson, 257 F.3d at 254 (internal quotation marks omitted).

Finally, while we in no way suggest that threats of physical harm could ever be justified by evaluations of an employee's work performance, we note that we have seen in this record no evidence that McCarthy's statements to Kaytor that he would like to see her in a coffin, kill her, or choke her were related to any deficiencies in her work performance. To the contrary, the record suggests that McCarthy's desire to choke Kaytor was distinctly not work-related, for McCarthy told Kaytor he "'wish[ed she] were retired'" so that he "'could come to [her]

- 26 -

home and choke [her]'" (Kaytor Dep. 188 (emphases added)). In sum, McCarthy's threats and statements wishing Kaytor physical harm are material to her claim that she was subjected to a gender-based hostile work environment.

Second, the district court impugned Kaytor's credibility as to the frequency of McCarthy's threats and thereby inappropriately assumed the role of factfinder. While noting that Kaytor testified that McCarthy had threatened her repeatedly, the court stated that "[t]here is a question as to how many times McCarthy did this," because Kaytor "could only recall one instance where he threatened to 'kill' her and one instance where he threatened to 'choke' her." Kaytor I, 2009 WL 840669, at *9 (emphasis added). Although Kaytor at her deposition could not recall dates or details of the other instances, her testimony that in fact there were many such instances would be admissible at trial. Electric Boat would of course be entitled to cross-examine her as to details, and Kaytor's ability or inability to recall details would doubtless affect the weight that would be given to her testimony. But the weighing of the evidence is a matter for the factfinder at trial, not for a court considering a motion for summary judgment, and the district court was not entitled to question the credibility of Kaytor's testimony that there were many such instances. Thus, the "question" highlighted by the court was not, on the motion for summary judgment, a proper consideration.

- 27 -

Third, the district court, in stating that Kaytor had alleged only "a few incidents that spanned a number of years," id. at *8--an expansive temporal impression that Electric Boat attempts to enhance by describing the period complained of as 2004-2006 (see Electric Boat brief on appeal at 9, 48)--did not view the evidence in the light most favorable to Kaytor, either with respect to the relevant period or the number of incidents. As to the relevant period, Kaytor testified that the bad years were 2004 and 2005 (see, e.g., Kaytor Dep. 187), and she has not alleged any harassment by McCarthy--nor any gender-based (as contrasted with retaliatory) harassment by anyone else at the Company--since McCarthy's gift of the pussy willow bush on April 27, 2005. Accordingly, at its longest, the period during which Kaytor complained of a gender-based hostile work environment was not several years, but rather 16 months. As to the number of incidents, the court was required, as indicated above, to take into consideration McCarthy's physical threats to Kaytor, and it had noted that McCarthy said he wanted to choke Kaytor on at least six occasions, told her he would like to see her in her coffin on six other occasions, and told her he wanted to kill her on three or four occasions. Kaytor I, 2009 WL 840669, at *3. In addition to those 15 or more incidents, Kaytor testified that McCarthy made complimentary, but unwelcome, comments about the way she smelled; that he approached her closely enough to smell her hair, making her uncomfortable; and that she caught him leering at her body "[m]any times" (Kaytor Dep. 245). And, of course there is the

- 28 -

evidence described above as to the several incidents in which McCarthy made explicit or implicit references to Kaytor's "ass" or genitalia and gave her the pussy willow bush. If a jury were to view the evidence in the light most favorable to Kaytor, it could easily conclude, permissibly, that there occurred a plethora of incidents in the relevant 16-month period and that the abuse was severe and/or pervasive.

We note that the district court pointed out that Kaytor, in her deposition, stated at times that McCarthy's threats were "out of character" (see Kaytor Dep. 183, 241), and the court inferred that that phrase "indicat[ed] that they were not pervasive," Kaytor I, 2009 WL 840669, at *9. This inference as to what Kaytor meant also failed to view the record in the light most favorable to Kaytor. We do not see that Kaytor was ever asked at her deposition precisely what she meant when she said that McCarthy was acting "out of character." Having testified that she and McCarthy had an amicable, businesslike relationship during the early years of their working together, i.e., 1998-2003, Kaytor could well have meant that McCarthy's harassing behavior from 2004 through April 2005 was simply inconsistent with the way he had behaved for the prior five or six years. The court's inference that by "out of character" Kaytor instead meant sporadic or "not pervasive" also seems unwarranted in light of her testimony that one of McCarthy's threats to kill her was made "[w]hen he was acting out of character, . . . and . . . was one of the many harassing incidents" (Kaytor Dep. 241), and in light of her use of

- 29 -

that phrase with respect to Crogle, stating that "[f]or two years [Crogle] acted out of character" (id. at 304 (emphasis added)).

Finally, the district court's analysis of the pussy willow gift plainly viewed that incident in isolation. The court stated that

> McCarthy's gift of a pussy willow was not necessarily sexual in nature at all, and the Court sees no evidence that it was meant to be so. The letter given with the pussy willow contains no sexual references, and the fact that the plant's name is similar to a slang term for female genitalia is not sufficient to demonstrate that the gift was, in fact, sexual in nature.

Kaytor I, 2009 WL 840669, at *8 (emphases added). Preliminarily, we note that although it may well be that if there were no history of sexual harassment or any gender-based comments the gift of a pussy willow bush would carry no sexual implications, the matter of whether the plant "necessarily" had a sexual connotation was not the proper inquiry on a motion for summary judgment by the defendant. More importantly, the court was required to view the gift of the pussy willow bush to Kaytor in the context of the other evidence in this case. That evidence, taken in the light most favorable to Kaytor, showed, inter alia, that McCarthy frequently made comments about women's bodies; that Kaytor many times caught McCarthy leering at her and staring at her body; and that McCarthy had already made two other blatant references to Kaytor's genitalia: stating on one occasion that Kaytor was about to spread her legs for her doctor; and on another, when Kaytor was going to see her gynecologist, that she was going where every man wanted to be. In light of this evidence, the district court could

- 30 -

not properly decide as a matter of law that the gift to Kaytor of a pussy willow bush neither had nor was intended to have any sexual connotations.

We conclude that the totality of the evidence, taken in the light most favorable to Kaytor and without questioning her credibility or drawing any adverse inference that a jury would not be required to draw, was sufficient to satisfy the Harris requirements that Kaytor show, both subjectively and objectively, that because of her gender, she was subjected to an abusive environment that altered her working conditions. Plainly Kaytor subjectively viewed her working environment as abusive. She repeatedly complained to her coworkers and to her union; she complained to McCarthy himself. Although initially brushing off his threats, Kaytor testified that the more McCarthy threatened, the more nervous she became. She eventually told McCarthy that if he did not stop harassing her, she would complain to higher management; she was deterred from doing so because he got a "horrid look on his face" and said that if she reported him he would kill her. And despite being severely frightened by that threat, when McCarthy gave Kaytor the pussy willow bush she complained to HR. On this record we see no basis for a conclusion that Kaytor did not subjectively view her environment as abusive.

There was also ample evidence to permit an inference that Kaytor's working environment was objectively abusive, i.e., that a reasonable person would find it abusive. A rational juror may permissibly find that a reasonable employee would view any serious

death threat or threat of physical harm as sufficiently severe to alter the employee's working conditions and create an abusive environment. Even such threats communicated in jest, if made repeatedly, may reasonably be viewed as sufficiently severe. In this case, several of Kaytor's coworkers who heard McCarthy's statements that he wanted to choke Kaytor advised her that she should be concerned. Indeed, Kaytor testified that her doctor told her she should be concerned. (See Kaytor Dep. 188.) Further, a rational juror could permissibly find that a reasonable employee would have viewed McCarthy's sexual comments and actions--including his frequent leering at Kaytor's body and his calling attention to her private parts by, inter alia, "yell[ing] out at the top of his lungs" for everyone to hear that Kaytor had a "flat ass" (id. at 180), "yell[ing]," when Kaytor was heading for the gynecologist, that she was "going where every man wants to be" (id. at 207), and finally giving Kaytor a pussy willow bush, which was the talk of the entire facility for days (see id. at 280-81; EB Report at 7)--as creating an environment that was abusive, humiliating, and materially worsening Kaytor's working conditions.

In sum, we conclude that the evidence of record, when properly viewed within the correct legal framework, was sufficient to require the denial of Electric Boat's motion for summary judgment on the hostile work environment claim.

C.  The Title VII Claims of Retaliation

Title VII also makes it unlawful for an employer to discriminate against an employee "because he [or she] has opposed any practice made an unlawful employment practice by this subchapter, or because he [or she] has made a charge . . . in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). In order to establish a prima facie case of retaliation, Kaytor must show (1) that she participated in an activity protected by Title VII, (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action. See, e.g., Patane v. Clark, 508 F.3d 106, 115 (2d Cir. 2007); Kessler v. Westchester County Department of Social Services, 461 F.3d 199, 205-06 (2d Cir. 2006). Close temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action. See, e.g., Clark County School District v. Breeden, 532 U.S. 268, 273 (2001); Cifra v. General Electric Co., 252 F.3d 205, 217 (2d Cir. 2001).

In adjudicating retaliation claims, courts follow the familiar burden-shifting approach of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). See, e.g., Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005). At the summary judgment stage, if the plaintiff presents at least a

- 33 -

minimal amount of evidence to support the elements of the claim, the burden of production shifts to the defendant to proffer a legitimate non-retaliatory reason for the adverse employment action. See id. If the employer produces such evidence, the employee must, in order to avoid summary judgment, point to evidence sufficient to permit an inference that the employer's proffered non-retaliatory reason is pretextual and that retaliation was a "substantial reason for the adverse employment action." Id.

Applying these principles, we reach different conclusions, for the reasons below, as to the viability of Kaytor's claims that she was subjected to retaliation (1) in the termination of her employment and (2) in her pre-termination treatment.

1. The Claim of Retaliatory Termination

The principal retaliation claimed by Kaytor was Electric Boat's termination of her employment a short time after she filed the present action. As the district court noted, Kaytor presented a prima facie case with respect to this claim. The court concluded, however, as described below, that Electric Boat presented evidence of a non-retaliatory reason for terminating Kaytor's employment, namely that, with good reason, the Company instructed Kaytor to have a psychiatric examination and warned that she would be discharged if she refused; that Kaytor refused; and that the Company fired her for insubordination.

As described in Kaytor I, 2009 WL 840669, at \*5-\*6, \*10-\*11, Electric Boat presented evidence that it maintained an on-site medical facility at which it employed nurses, physician assistants, and physicians, including Robert Hurley, M.D., a board-certified physician who supervised the facility. One of Dr. Hurley's principal responsibilities was to make determinations as to employees' fitness to perform the functions of their jobs. Dr. Hurley had training in interviewing, evaluating, and treating common psychiatric disorders, and he often sought outside opinions from specialists as part of his fitness-for-duty determinations. (See Declaration of Dr. Robert Hurley dated March 26, 2008 ("Hurley Decl."), ¶¶ 4, 8, 10.)

On January 4, 2007, two days after Kaytor returned to work from a medical leave of absence, some of the Electric Boat plant facilities had to be evacuated because of an explosion in one of the laboratories, and employees took refuge in the Company's cafeteria. In the cafeteria, Kaytor experienced dizziness, and she went to the medical facility. While there, she spoke at some length with Dr. Hurley. During that conversation, Kaytor expressed her views, inter alia, that there might be a hidden camera in Dr. Hurley's office; that Electric Boat was spying on her at work and in her home; that a therapeutic counselor she had been consulting was conspiring with Electric Boat to spy on her; and that Dr. Hurley was a part of the conspiracy against her. (See Kaytor Dep. 334; Hurley Decl. ¶ 14.)

This January 4, 2007 meeting with Kaytor caused Dr. Hurley to question her fitness for duty. (See Hurley Decl. ¶ 23.) He also received from Kaytor a January 4, 2007 email in which she stated, inter alia, that she had had to "release" all of her doctors because they had been "targeted" by Dr. Hurley and Electric Boat's legal department. (Hurley Decl. ¶ 17 & Exhibit 2.) And on the following day, Kaytor sent him another email stating, inter alia, that Electric Boat was intentionally trying to make her sick. (See Hurley Decl. ¶ 20 & Exhibit 5.) In addition, Dr. Hurley had previously received communications from Kaytor that made him question her fitness for duty. These included a September 2006 letter in which Kaytor complained that Electric Boat was sending her to doctors who, in giving "skin sensation test[s]," punctured her thighs and "le[ft] medical equipment in [her] legs." (Hurley Decl. ¶ 16 & Exhibit 1.)

Dr. Hurley, in light of these experiences, determined that Kaytor should have an examination as to her psychiatric fitness for duty. Electric Boat, to show that Dr. Hurley's concerns about Kaytor's mental state were reasonable, also presented deposition testimony from two professionals who were not employees of the Company--Kaytor's personal primary care physician and a licensed counselor who had treated Kaytor--who stated that they viewed Kaytor as having paranoid ideation.

On or about January 8, 2007, Dr. Hurley scheduled Kaytor for a January 11, 2007 independent medical examination with Dr. Jay Lasser, a psychiatrist. However, Kaytor had a conflicting

appointment and could not see Dr. Lasser on January 11. On January 17, 2007, when Kaytor had not rescheduled, the Company sent her a letter instructing her to reschedule by January 24, 2007. The letter stated that "Dr. Hurley will be unable to make a determination on your return to work without further information from Dr. Lasser," and that if Kaytor did not reschedule, her refusal would be considered an act of insubordination and her employment would immediately be terminated. (Letter from Linda G. Gastiger, Manager of Labor Relations, Electric Boat, to Sharon Kaytor, dated January 17, 2007.)

Kaytor refused to schedule an appointment with Dr. Lasser. She testified that although she received and understood this letter, she did not believe the Company would terminate her employment. (See Kaytor Dep. 343-44.) In accordance with its warning, however, and in light of Kaytor's failure to schedule an appointment with Dr. Lasser, the Company sent Kaytor a letter on January 25, 2007, informing her that her employment was terminated on account of her insubordination. (See Letter from Linda G. Gastiger, Manager of Labor Relations, Electric Boat, to Sharon Kaytor, dated January 25, 2007.)

The district court found Electric Boat's proffer ample to show a non-retaliatory reason--Kaytor's repeated exhibition of signs of paranoia--for ordering the independent psychiatric examination and for terminating her employment because of her refusal to do so, and we agree. The court also concluded that Kaytor presented no evidence from which a rational juror could

find that that proffered reason was pretext for retaliation. Kaytor has not pointed us to evidence in the record sufficient to warrant overturning that conclusion. Accordingly, we affirm the dismissal of Kaytor's claim that the termination of her employment violated Title VII for the reasons stated by the district court in Kaytor I, 2009 WL 840669, at *5-*6, *10-*11.

2. The Claim of Pre-Termination Retaliation

Kaytor also claims that she was subjected to retaliation prior to her termination, arguing, inter alia, that because she complained to HR about McCarthy's abuses, she was in effect demoted by being reassigned to work for a person who reported to McCarthy, was placed in an office containing health hazards, was repeatedly summoned by HR to meetings that she considered superfluous, was given no work to do, was constantly yelled at by her new supervisor, and was ostracized. We conclude that Kaytor's deposition testimony was sufficient evidence to defeat the summary judgment dismissal of this claim.

Preliminarily, we note that Electric Boat contends that Kaytor has abandoned any contention "that her transfer to a different supervisor after her complaints about McCarthy[] constituted unlawful retaliation," because she "does not raise this argument in her main brief" on appeal and had not raised it in the district court until she moved for reconsideration following the district court's grant of summary judgment. (Electric Boat brief on appeal at 62 n.7.) The district court,

- 38 -

before rejecting this claim on its merits in <u>Kaytor II</u>, stated in <u>Kaytor I</u> that Kaytor had abandoned any claim of pre-termination retaliation, <u>see</u> Part I.C. above. We note, however, that in responding to Electric Boat's motion for summary judgment, Kaytor had argued, <u>inter alia</u>, that

> she was subjected to adverse employment actions after she reported sexual harassment by her supervisor which amounted to a hostile work environment. She had been the administrative assistant to the Manager of a work unit . . . , but when she complained about his use of obscenities and sexual comments, she was transferred to work under Al Crogle, who supervised one of six work groups reporting to McCarthy.

(Kaytor's Memorandum of Law in Opposition to Defendant Motion for Summary Judgment at 2.) She referred to the Company's order that she undergo a psychiatric examination as "<u>further</u> retaliation" (<u>id</u>. (emphasis added)) and argued that she had been "punished for raising the issue of a hostile work environment" (<u>id</u>. at 7). And in the retaliation section of her main brief on this appeal, she refers not only to having been "forc[ed] . . . to submit to a psychiatric exam," but also to, <u>inter alia</u>, being "transferr[ed] . . . to a less prestigious work assignment," and having "her job responsibilities" "take[n] away." (Kaytor brief on appeal at 21.) Although the arguments as to pre-termination retaliation are sketchy, we are unpersuaded that the claim was abandoned.

Turning to the merits, we note that a lateral job transfer that does not affect an employee's salary or title may be the basis for a Title VII retaliation claim only if the reassignment would have been viewed by a reasonable employee as being materially adverse. <u>See</u>, <u>e.g.</u>, <u>Burlington Northern & Santa Fe Ry.</u>

- 39 -

_Co. v. White_, 548 U.S. at 68. The test is an objective one; an employment action is materially adverse if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." _Id_. (internal quotation omitted); _see_, _e.g._, _Kessler v. Westchester County Department of Social Services_, 461 F.3d at 209.

Plainly the reassignment of Kaytor to Crogle was occasioned by her complaint to HR about McCarthy. The HR investigation was commenced on May 15, and Kaytor was reassigned on May 16. And there is circumstantial evidence from which a rational factfinder could infer that the Company itself viewed Kaytor's new position as a demotion, given that, on the day after it reassigned her to Crogle, it asked Kaytor if she wanted to return to her old position. But the Company notes that Kaytor's compensation was unchanged, and it plausibly argues that it was merely reasonably separating Kaytor from a manager she claimed was harassing her. The district court found this dispositive of the merits of this claim in _Kaytor II_.

Yet the separation of Kaytor from McCarthy does not account for the ensuing treatment of Kaytor or resolve the question of whether other conditions of her employment were so adversely affected as to dissuade complaints of discrimination. According to her deposition testimony, which must be credited on a motion for summary judgment, Kaytor, after being reassigned, was stripped of her former prestigious responsibility of ordering supplies for the entire engineering department (_see_ Kaytor Dep.

14, 16-17), was given "no work to do" (id. at 299), was screamed at by Crogle "on a daily basis" for "th[e] whole department" to hear (id. at 299, 301), and "was ostracized" (id. at 299).

A jury, of course, need not credit Kaytor's testimony or view the evidence in the light most favorable to her. But given the summary judgment standards, we conclude that there are genuine issues of fact to be tried as to whether the Company's treatment of Kaytor, following her complaints about McCarthy and prior to the termination of her employment, "well might have dissuaded a reasonable worker from making" those complaints.

D.  The State-Law Claims

Kaytor asserted her claims of gender discrimination and retaliation not only under Title VII but also under the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 et seq. ("CFEPA"). CFEPA prohibits employers from, inter alia, discriminating against an employee "because of the individual's . . . sex," Conn. Gen Stat. § 46a-60(a)(1), or "because such person has opposed any discriminatory employment practice," id. § 46a-60(a)(4). The analysis of discrimination and retaliation claims under CFEPA is the same as under Title VII. See, e.g., Craine v. Trinity College, 259 Conn. 625, 637 n.6, 791 A.2d 518, 531 n.6 (2002). Accordingly, for the reasons stated above with respect to Kaytor's claims under Title VII, we affirm the district court's dismissal of Kaytor's claim of retaliatory termination in violation of CFEPA; but as to her CFEPA claims of

hostile work environment and pre-termination retaliation, we vacate the dismissal and remand for further proceedings.

We affirm the district court's dismissal of Kaytor's claim of intentional infliction of emotional distress substantially for the reasons stated by the district court in Kaytor I, see 2009 WL 840669, at *11-*12.

## CONCLUSION

We have considered all of the parties' arguments in support of their respective positions on this appeal and, except as indicated above, have found them to be without merit. The judgment of the district court is affirmed insofar as it dismissed Kaytor's claims of retaliatory termination and intentional infliction of emotional distress. The judgment is vacated insofar as it dismissed her claims of hostile work environment and pre-termination retaliation, and the matter is remanded for further proceedings not inconsistent with this opinion.

Costs to plaintiff.